# EXHIBIT 1

## to Declaration of Chad Brueck

*Anthony Cervantes' January 3, 2018*
*Independent Contractor Operating Agreement*

# CRST EXPEDITED, INC.

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT

Rev. October 2017

*THIS AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, WHICH ARE HIGHLIGHTED IN* __*BOLDFACED UNDERLINED TYPE*__*.*

CRST EXPEDITED, INC. INDEPENDENT CONTRACTOR OPERATING AGREEMENT

## TABLE OF CONTENTS

| Section | | | Page |
|---|---|---|---|
| 1. | | CONTRACTOR'S EQUIPMENT AND SERVICES | 1 |
| | 1(A) | Provision of Equipment and Services | 1 |
| | 1(B) | Team Driving | 1 |
| | 1(C) | No Limitations on Contractor's Use of Equipment | 1 |
| | 1(D) | Exclusive Possession, Control, and Use | 1 |
| | 1(E) | Subleases and Other Alternative Uses of Equipment | 2 |
| 2. | | GROSS COMPENSATION | 4 |
| 3. | | SETTLEMENT PERIOD AND DOCUMENTATION | 4 |
| | 3(A) | Settlement | 4 |
| | 3(B) | Documentation | 4 |
| 4. | | COMPLIANCE WITH LEGAL AND CUSTOMER REQUIREMENTS | 4 |
| | 4(A) | Maintenance and Inspection | 5 |
| | 4(B) | Equipment Identification | 5 |
| | 4(C) | Lawful and Safe Operations | 5 |
| | 4(D) | Drivers | 6 |
| | 4(E) | Driver Records | 7 |
| | 4(F) | Passenger Authorization | 7 |
| | 4(G) | Paperwork Requirements | 7 |
| | 4(H) | Customer Requirements | 7 |
| 5. | | CONTRACTOR'S RESPONSIBILITIES | 8 |
| | 5(A) | Workers | 8 |
| | 5(B) | Equipment | 8 |
| | 5(C) | Routes and Completion of Performance | 8 |
| | 5(D) | Loading | 8 |
| | 5(E) | Use of Communications Equipment | 8 |
| | 5(F) | Operating Expenses | 8 |
| | 5(G) | Base Plates and Permits | 10 |
| | 5(H) | Use of Carrier's Trailer(s) | 10 |
| 6. | | CHARGE-BACKS | 10 |
| | 6(A) | Deductions Table | 10 |
| | 6(B) | Information Regarding Deductions | 10 |
| | 6(C) | Changes in Existing Deduction Items | 10 |
| | 6(D) | No Required Purchases from Carrier | 10 |
| 7. | | INDEMNIFICATION AND HOLD HARMLESS | 10 |
| | 7(A) | In General | 10 |
| | 7(B) | Indemnity Limits | 11 |
| | 7(C) | Carrier's Coverage | 11 |
| | 7(D) | Claims by Contractor or other Contractors | 11 |
| | 7(E) | Reclassification | 11 |
| | 7(F) | Indemnification by Carrier | 12 |
| 8. | | ESCROW FUND | 12 |
| | 8(A) | Principal | 12 |
| | 8(B) | Specific Items to Which Escrow Funds May Be Applied | 12 |
| | 8(C) | Accountings | 12 |
| | 8(D) | Interest | 13 |
| | 8(E) | Final Settlement | 13 |
| | 8(F) | Return Of Escrow Balance | 13 |
| 9. | | CONTRACTOR NOT EMPLOYEE OF CARRIER | 13 |
| | 9(A) | In General | 13 |
| | 9(B) | Certification of Status | 13 |
| | 9(C) | Selection of Equipment, Maintenance, and Routes | 13 |

|   | 9(D) | Contractor's Workers | 13 |
|   | 9(E) | Taxes | 14 |
|   | 9(F) | The Parties' Financial Obligations If Contractor Is Determined to Be an Employee | 14 |
| 10. | INSURANCE | | 15 |
|   | 10(A) | Carrier's Insurance Obligations | 15 |
|   | 10(B) | Contractor's Insurance Obligations | 16 |
|   | 10(C) | Requirements Applicable To All Of Contractor's Insurance Coverages | 16 |
|   | 10(D) | Contractor's Liability If Required Coverages Are Not Maintained | 16 |
|   | 10(E) | Availability Of Insurance Facilitated By Carrier | 17 |
|   | 10(F) | Changes In Cost Or Other Details Of Coverages | 17 |
| 11. | CONTRACTOR COOPERATION | | 17 |
| 12. | CONTRACTOR'S NONPERFORMANCE | | 17 |
| 13. | NOTICES | | 18 |
| 14. | DURATION OF AGREEMENT AND TERMINATION | | 18 |
|   | 14(A) | Term | 18 |
|   | 14(B) | Equipment Receipt | 18 |
|   | 14(C) | Termination | 18 |
|   | 14(D) | Reasons for Unilateral Termination by a Party | 18 |
|   | 14(E) | Survival of Liabilities and Entitlements | 18 |
| 15. | CONTRACTOR'S OBLIGATIONS UPON TERMINATION | | 18 |
|   | 15(A) | Completion of Performance | 18 |
|   | 15(B) | Return of Carrier's Property | 19 |
|   | 15(C) | Remedies for Failure to Return Carrier's Property | 19 |
| 16. | FORM OF AGREEMENT AND MISCELLANEOUS PROVISIONS | | 19 |
|   | 16(A) | General | 19 |
|   | 16(B) | Severability | 19 |
|   | 16(C) | Waiver | 19 |
|   | 16(D) | Complete Agreement | 19 |
|   | 16(E) | Copies of This Agreement and Statement of Lease | 19 |
| 17. | GOVERNING LAW | | 20 |
| 18. | BINDING EFFECT | | 20 |
| 19. | COLLECTION EXPENSES | | 20 |
| 20. | AUTHORITY TO COMPLETE CREDIT CHECK | | 20 |

EQUIPMENT RECEIPT

APPENDIX A – CONTRACTOR ELECTION FORM

SUPPLEMENT 1 – CRST FUEL PURCHASING PROGRAM

OMNITRACS, LLC SYSTEM RECEIPT

APPENDIX B – CONTRACTOR COMPENSATION

APPENDIX C – SUBLEASE OF EQUIPMENT

QUALIFICATION CERTIFICATE

APPENDIX D – CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS

APPENDIX E – PRIVACY RELATED DISCLOSURES AND CONSENT FORM

STATEMENT OF LEASE

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT

CRST Expedited, Inc. ("Carrier"), an authorized for-hire interstate motor carrier registered with the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT") and applicable State and foreign authorities, and the undersigned independent contractor ("Contractor"), together the "Parties," in consideration of the mutual covenants herein contained and pursuant to the Federal Truth-in-Leasing Regulations, 49 C.F.R. Part 376, enter into this Independent Contractor Operating Agreement (the "Agreement").

## 1.    CONTRACTOR'S EQUIPMENT AND SERVICES.

**1(A).    Provision of Equipment and Services.** Contractor warrants that he/she is the "owner" of the equipment set forth in the attached Equipment Receipt and Section 1 of Appendix A (**Contractor Election Form**) or as supplemented in an Addendum ("Equipment") within the meaning of 49 C.F.R. § 376.2(d) and has full authority to contract the Equipment and services to Carrier; and that the Equipment is in good, safe, and efficient operating condition, meets all applicable federal, state, local, and foreign requirements, and is in all respects fit and serviceable for the use intended under this Agreement. Contractor hereby provides Carrier with professional truck driving services, other incidental transportation-related services, and the use of the Equipment.

**1(B).    Team Driving.** To maximize Carrier's efficiency in meeting its customers' expedited transportation needs, Contractor agrees to have the Equipment operated using two-driver teams only, except when:

**1(B)(1).** Contractor has entered into a Lead Driver Program Addendum to this Agreement and a Contractor driver ("Lead Driver") is dropping off a Carrier driver-candidate employee under such Program ("Student Driver") at a Carrier-designated location and heading to Contractor-designated time not furnishing services under this Agreement ("Home Time");

**1(B)(2).** Lead Driver is coming back from Home Time and heading to pick up a Student Driver;

**1(B)(3).** Lead Driver has dropped off a Student Driver at a Carrier-designated location and no other Student Driver is immediately available to form a driving team with Lead Driver;

**1(B)(4).** Lead Driver has dropped off a Student Driver at a Carrier-designated location and is heading to pick up another Student Driver at a different location;

**1(B)(5).** One of Contractor's team drivers ("Team Driver") has dropped off co-Team Driver at home or other location for Home Time and is heading to another location for his/her own Home Time;

**1(B)(6).** Team Driver is coming back from Home time and heading to pick up co-Team Driver;

**1(B)(7).** Co-Team Driver is absent from the Equipment for no more than seven consecutive cal-

endar days due to illness or other urgent personal business;

**1(B)(8).** Lead Driver or Team Driver whose Student Driver or co-Team Driver, respectively, is riding in but not driving the Equipment for no more than seven consecutive calendar days because the other driver has been temporarily disqualified by Carrier from driving (due to expiration of commercial driver's license or other reason approved by Carrier);

**1(B)(9).** Lead Driver or Team Driver is dispatched by Carrier to a Carrier terminal in connection with termination of this Agreement by Contractor or Carrier; or

**1(B)(10).** Carrier has disqualified a Student Driver or Co-Team Driver from driving, or the Student Driver or Co-Team Driver has ended his/her service with Carrier or Contractor, respectively, and Contractor's other Team Driver is heading to pick up another Student Driver or Co-Team Driver (not to exceed fourteen (14) consecutive calendar days).

**1(C).    No Limitations on Contractor's Use of Equipment.** Carrier does not agree to make any minimum use of the Equipment, to use the Equipment at any particular time or location, or to furnish any specified number of loads or pounds of freight to Contractor or to guarantee any amount of revenue to Contractor. Contractor is free to accept or reject any specific shipment offered by Carrier. Contractor is not prohibited from entering into separate agreements to provide other equipment and other professional truck drivers, not identified as Equipment above or in an appendix and drivers not used to service this Agreement, to other motor carriers. Nor is Contractor, consistent with Section 1(E) of this Agreement, prohibited from using the Equipment for the pick up, transportation, or delivery of property for more than one common carrier or other person or entity.

**1(D).    Exclusive Possession, Control, and Use.** Carrier and Contractor intend to relate to each other entirely as independent contractors, not as employer and employee. Nevertheless, solely to comply with 49 C.F.R. § 376.12(c)(1), Carrier shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement. Contractor may operate the Equipment for another motor carrier during this Agreement only with Carrier's prior written consent (which shall not be unreasonably withheld) and only if done under a sublease between Carrier and the other authorized carrier (including Contractor, if Contractor has the requisite motor carrier registration/operating authority(ies) and insurance) pursuant to 49

C.F.R. § 376.12(c)(2), as applicable and the terms of Subsection E of this Section. Carrier shall not sublease the Equipment to another carrier without Contractor's prior written consent (which consent shall not be unreasonably withheld). Carrier shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement, except when the Equipment is under sublease by Carrier to another authorized carrier. Any such sublease shall state that the sublessee-carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the sublease.. The foregoing declarations are made in order to comply with DOT regulations (49 C.F.R. § 376.12(c)) and shall not be used to classify Contractor as an employee of Carrier. As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether Contractor's drivers are independent contractors or employees of Carrier and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements."

**1(E).    Subleases and Other Alternative Uses of Equipment.** At Contractor's request, Carrier may, with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of Carrier only under the terms and conditions set forth in this Subsection (E). The other uses may consist of (together, "Alternative Uses of Equipment"): **(i) Sublease** -- Carrier subleases the Equipment (including driving services furnished by Contractor) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; **(ii) Contractor Motor Carriage** -- Contractor uses Contractor's own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker), in which event, the provisions of this Subsection (E) relating to CONTRACTOR Motor Carriage shall be deemed to constitute the sublease required by 49 C.F.R. § 376.12(c)(2); and **(iii) Exempt Motor Carriage** -- Contractor, lacking motor carrier operating authority of Contractor's own but possessing a validly-issued DOT Number, lawfully provides for-hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier (directly or through a motor freight broker).

**1(E)(1).    Carrier's Authorization and Release.** To obtain Carrier's authorization for each Alternative Use of Equipment, Contractor shall take the following steps before accepting a trip:

**1(E)(1)(a).    For Alternative Uses of Equipment Involving Subleases,** Have the Sublease Carrier complete, sign, date, and then fax, or scan and email, to Carrier a sublease in the form appended as **Appendix C (Sublease)** of this Agreement ("Sublease"), together with the Sub-

lease Carrier's certificate of insurance required by Section 5 of the Sublease;

**1(E)(1)(b).    For Alternative Uses of Equipment Involving Contractor Motor Carriage.** Telephone or email Carrier's dispatch and provide it with valid information about Contractor wishing to arrange the Alternative Use of Equipment -- name, address, identification number (which shall be the U.S. Department of Transportation number for · interstate private carriers, any applicable state number for intrastate private carriers, and the Federal Employer Identification Number for other private carriers and shippers), phone number, email address, and individual contact's name -- and about the planned trips (dates, times, and city and state of pickup and delivery). Contractor shall obtain an oral or emailed release from Carrier's dispatch, and Contractor shall display the Carrier release number on the trip sheet submitted to Carrier after the trip; and

**1(E)(1)(c).    For Alternative Uses of Equipment Involving Exempt Motor Carriage.** Contractor shall submit to Carrier proof (including in the form of a printout of a search on http://li-public.fmcsa.dot.gov) that it has obtained a validly-issued DOT Number (and the name and State under which DOT has listed the DOT Number) and telephone or email Carrier's dispatch and provide it with valid information about the shipper or private carrier (same information as required in Section 1(E)(1)(b) above) and about the planned trips (dates, times, and city and state of pickup and delivery). Contractor shall obtain an oral or emailed release from Carrier's dispatch, and Contractor shall display the Carrier release number on the trip sheet submitted to Carrier after the trip.

**1(E)(2).    Compensation For All Alternative-Use-of-Equipment Operations.** In connection with a Sublease or other Alternative Use of Equipment, Contractor agrees that:

**1(E)(2)(a).    Contractor** shall submit any necessary Sublease- or other Alternative Use-related shipping documents to, and obtain settlement compensation directly and exclusively from, Sublease Carrier (in the case of Sublease trips) or the shipper or private carrier (in the case of Contractor Motor Carriage or Exempt Motor Carriage trips). Notwithstanding anything in this Agreement to the contrary, Carrier shall have no responsibility for collecting freight charges or paying settlement compensation to Contractor for any Alternative-Use-of-Equipment trip; and

**1(E)(2)(b).    To avoid any implication** that Carrier is subsidizing Contractor's independent business use of the Equipment, Contractor shall pay Carrier the per-trip Alternative-Use-Fee stated in Section 4 of **Appendix A (Contractor Election Form)** to help defray Carrier's administrative, regulatory, state tax, and possible insurance costs in

connection with the Alternative-Use-of-Equipment trip.

### 1(E)(3).    Carrier's Identification.

1(E)(3)(a).    Subleases. For the duration of any Sublease, Contractor shall remove or cover up all of Carrier's identification on the Equipment and display instead the Sublease Carrier's identification; and

1(E)(3)(b).    Contractor Motor Carriage. For any trip under Contractor's own operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier, Contractor shall remove or cover up all of Carrier's identification on the Equipment and display instead Contractor's identification. If Contractor possesses interstate or intrastate operating authority and no other motor carrier booked the shipment, the shipment, even if exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., shall be deemed to be one involving Contractor Motor Carriage

1(E)(3)(c).    Exempt Motor Carriage. For any trip by Contractor, lacking Contractor's own operating authority but possessing a validly-issued DOT Number, on which it provides for-hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier, Contractor shall remove or cover Carrier's identification from the Equipment and shall display Contractor's DOT Number and DOT-listed name (or, if applicable, D.B.A. Name) on the Equipment for the duration of each Exempt Motor Carriage trip.

1(E)(4).    Control of and Responsibility for the Equipment. As required by 49 C.F.R. § 376.12(c)(1), Carrier, except for Sublease and Contractor Motor Carriage trips, shall with respect to the public have exclusive possession, control, and use of the Equipment, and assume complete responsibility for the operation of the Equipment, for the duration of this Agreement. For Sublease trips, Carrier's sublease to Sublease Carrier shall, in accordance with 49 C.F.R. § 376.22(c)(2), provide that Sublease Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the Sublease. For Contractor Motor Carriage trips, which also constitute subleasing, Contractor shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of trip.

1(E)(5).    Insurance. For Alternative-Use-of-Equipment trips, just as for trips performed on behalf of Carrier, Carrier's and Contractor's insurance obligations shall be as set forth in Section 10 of this Agreement, provided that:

1(E)(5)(a).    Subleases. As between Sublease Carrier and Carrier, the sublease shall provide that Sublease Carrier's public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage insurance shall cover the Equipment for the duration of the Sublease; be in at least the amounts required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than One Million dollars ($1,000,000), with a deductible no greater than Two Thousand Five Hundred dollars ($2,500), for injury or death to any person or for damage to property in any one occurrence); and be primary to any insurance coverages that Carrier may maintain; and

1(E)(5)(b).    Contractor Motor Carriage. With respect to Alternative-Use-of-Equipment trips involving Contractor Motor Carriage (using Contractor's own operating authority), Contractor shall, and hereby warrants that he/she does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least the amounts required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than One Million dollars ($1,000,000), with a deductible no greater than Two Thousand Five Hundred dollars ($2,500), for injury or death to any person or for damage to property in any one occurrence), covering the Equipment for the duration of the Alternative-Use-of-Equipment trips. Contractor shall provide a valid certificate of insurance evidencing such coverages to Carrier before accepting any Alternative-Use-of-Equipment trips involving Contractor Motor Carriage. On such trips, as between Contractor and Carrier, Contractor's public-liability insurance and cargo loss-and-damage insurance policies shall be primary to any insurance coverages that Carrier may maintain.

1(E)(5)(c).    Exempt Motor Carriage. Carrier's public liability coverage and cargo loss-and-damage coverage pursuant to Section 10(A) this Agreement shall apply to Exempt Motor Carriage trips.

1(E)(6).    Fuel Tax Reporting and Payment. With respect to fuel tax reporting for all Alternative-Use-of-Equipment trips (including a Sublease, Contractor Motor Carriage, or Exempt Motor Carriage), unless Contractor has elected, pursuant to Section 5(F)(2)(a) of this Agreement, to obtain Contractor's own IFTA Fuel Tax Permit and perform Contractor's own fuel and mileage tax reporting, Carrier shall be deemed the reporting entity with respect to the Equipment and the fuel consumed by the Equipment, and Carrier shall perform (directly or through an outside vendor) all fuel and mileage reporting on Contractor's

behalf. Contractor shall provide Carrier promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state. Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement quarterly any amount stated in Section 5(F)(2)(a)(2) of this Agreement.

1(E)(7).    International Registration Plan Reporting. With respect to International Registration Plan reporting for all Alternative-Use-of-Equipment trips (including a Sublease, Contractor Motor Carriage, or Exempt Motor Carriage), Carrier shall be responsible for reporting all miles traveled by Contractor's Equipment and in what state(s). Contractor shall provide Carrier promptly with documentation showing all miles traveled by state for each trip.

1(E)(8).    Driver Logs.    With respect to Sublease trips, Contractor shall submit a copy of all driver logs to both Carrier and Sublease Carrier after each trip. All driver logs should name both Carrier and Sublease Carrier; show all duty time for each 24-hour period of each trip; and the beginning and finishing time (designating a.m. or p.m.) worked for each identified motor carrier. Pursuant to 49 C.F.R. § 395.8(j), before each Sublease trip, Contractor shall provide to Sublease Carrier a signed statement stating the Contractor's total time on duty during the immediately preceding seven days and the time at which Contractor was last relieved from duty prior to beginning work for Carrier.

1(E)(9).    Driver Vehicle Inspection Reports and Repair Records. With respect to Sublease and Contractor Motor Carriage trips, Contractor shall prepare and submit to Carrier a written Driver Vehicle Inspection Report complying with the requirements of 49 C.F.R. § 396.11, and Carrier shall obtain and maintain all records relating to repairs of the Equipment.

1(E)(10).    Remaining Agreement Terms. In all other respects, the terms of this Agreement shall apply to Contractor's Alternative-Use-of-Equipment operations.

2.    GROSS COMPENSATION.    Contractor's gross compensation shall be as set forth in Appendix B (Contractor Compensation), and such gross compensation shall constitute the total compensation for the use of the Equipment and for everything furnished, provided, done by, or required of Contractor in connection with this Agreement, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services. As indicated in Section 5(F) (Operating Expenses) and Section 6 (Charge-Backs) of this Agreement, Contractor – as an independent contractor, not an employee – agrees to pay all of Contractor's operating expenses (including but not limited to those that Carrier ini-

tially advances and later charges back to Contractor) out of the gross compensation provided under this Section and Appendix B (Contractor Compensation) and any other Contractor moneys. Under no circumstances shall Carrier be responsible for such operating expenses.

3.    SETTLEMENT PERIOD AND DOCUMENTATION.

3(A).    Settlement.    Carrier shall settle with Contractor, paying Contractor any Settlement Compensation, as defined in Section 6(A) of this Agreement within fifteen (15) calendar days after submission by Contractor or Contractor's agent, by mail or in person, of properly completed logs required by FMCSA and those documents, in proper form, necessary for Carrier to secure payment from the shipper, including but not limited to trip sheets, delivery receipts, loading/unloading records, bills of lading, and any other receipts for which compensation is to be paid. Contractor shall submit such driver logs and delivery documents to Carrier at its main headquarters or at such other place as Carrier may designate. Payment shall not be made contingent, however, upon submission of a clean bill of lading -- that is, one to which no exceptions have been taken. At each weekly settlement, Carrier shall furnish to Contractor, by the method chosen by Contractor in Section 5 of Appendix B (Contractor Compensation), a statement detailing all debit and credit entries since the preceding statement ("Settlement Statement").

3(B).    Documentation.    If compensation is based on a percentage of the revenue for a shipment, Carrier shall provide Contractor, before or at the time of settlement, with a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. Contractor shall be permitted to examine Carrier's tariffs, or in the case of contract carriage, other documents from which rates and charges are computed, and documents underlying any computer-generated document, at its main headquarters during normal business hours. If rates and charges are computed from a contract, Contractor is entitled to examine only those portions of the contract containing the same information as would appear on a rated freight bill. Carrier may delete the names of shippers and consignees shown on the freight bill or other form of documentation. Carrier has the exclusive right to set the rates and amounts charged to Carrier's customers, shippers, consignors, or consignees, and nothing in this Agreement shall be construed to limit that right.

4.    COMPLIANCE WITH LEGAL AND CUSTOMER REQUIREMENTS. Neither Contractor nor Carrier shall engage in, or attempt, conspire, or threaten to engage in, any act or omission that would constitute a felony or intentional tort, whether or not relating to or arising out of operations under this Agreement. In addition, Contractor recognizes that Carrier's business of providing motor carrier freight transportation service to the public is subject to the requirements of Carrier's customers and to regulation by the federal government acting through DOT, and by various other federal, state, local, and foreign authorities. Contractor hereby acknowledges that he/she possesses full and complete understanding and knowledge of the applicable re-

quirements of all such authorities, including but not limited to DOT (including FMCSA's Compliance, Safety, Accountability ("CSA") Program), state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), and of all customer requirements provided to Contractor in writing. Accordingly, Contractor shall adhere to the following provisions of this Agreement to aid Carrier in discharging its legal duties and customer-service responsibilities:

**4(A).   Maintenance and Inspection.** Contractor, at Contractor's expense, shall equip and maintain the Equipment in accordance with all applicable government regulations including but not limited to ensuring the Equipment's systematic repair and maintenance and keeping it in compliance with the laws and regulations of federal, state, local, or foreign authorities, and Carrier's safety and equipment maintenance policies. In order to ensure compliance with all such requirements, Contractor shall make the Equipment available for inspection by Carrier, at Carrier's expense, at any time upon reasonable request by Carrier. Contractor also shall have the Equipment inspected, at Carrier's expense, once annually in accordance with 49 C.F.R. § 396.17, either at Carrier's maintenance facility or another maintenance facility that Carrier authorizes. Contractor shall bear the expense of any additional inspections of the Equipment. To facilitate Carrier's compliance with 49 C.F.R. Part 396, Contractor shall keep and maintain, or cause to be kept and maintained, systematic records of the repair and maintenance of the Equipment, and shall, when requested orally or in writing by Carrier, promptly forward to Carrier all inspection, repair, or maintenance records requested.

**4(B).   Equipment Identification.** Contractor shall apply, before placing the Equipment in Carrier's service, to the outside of the Equipment such identification as Carrier may designate in accordance with the requirements of all applicable federal, state, local, or foreign authorities, provided that Contractor shall first remove any paint, decals, or other items that, in Carrier's reasonable judgment, would interfere with such identification or be otherwise offensive. Carrier reserves the right to require from time to time the repainting or remarking of the Equipment at Contractor's expense. Upon termination of this Agreement or any other time the Equipment is being operated on behalf of any other carrier pursuant to Section 1(E) of this Agreement, Contractor shall immediately, at Contractor's expense, remove, paint over, or, in the case of operations on behalf of another entity, completely cover over, all of Carrier's identification (see Section 14 of this Agreement for requirements at termination of Agreement) all of Carrier's identification. At no time during this Agreement shall Contractor place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of Carrier, without Carrier's prior written consent pursuant to Section 1(E) of this Agreement (which consent shall not be unreasonably withheld).

**4(C).   Lawful and Safe Operations.**

**4(C)(1).   In General.** Contractor shall ensure that he/she and all drivers or other personnel he/she furnishes shall (a) drive or otherwise perform in

a safe manner at all times so as to avoid actual or threatened commitment of a felony or intentional tort, endangering the public, the driver, and/or the property being transported; (b) adhere to and perform the terms of this Agreement; the requirements of all Applicable Law, Carrier's operating authorities, and, conditioned only upon Point (a) of this Subsection, all customer requirements (to the extent provided by Subsection (H) of this Section), and Carrier Policies and Procedures[1]; and (C) do not, in Carrier's reasonable judgment, cause, in whole or in part, through negligence, gross negligence, or willful misconduct, an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5.

**4(C)(2).   Compliance, Safety, Accountability Program.** The parties understand that, as discussed in FMCSA's CSA *Carrier Safety Measurement System Methodology* (Feb. 2013, Version 3.0) ("SMS"), as amended from time to time by FMCSA and published online at http://csa.fmcsa.dot.gov/Documents/SMSMethodology.pdf, FMCSA will impose negative points for violations found during roadside inspections under the seven CSA Behavior Analysis Safety Improvement Categories ("BASICs"). Collectively, the negative points accumulated across a carrier's fleet (including the vehicles of all contractors under lease to the carrier), help determine the carrier's CSA rating. Accordingly, Contractor, and any drivers of Contractor, shall at all times meet the CSA Program's safety standards sufficient to enable Carrier to (a) achieve and maintain a "fit" or similar rating that enables Carrier to operate without FMCSA intervention or restriction pertaining to any of the seven safety evaluation areas measured by CSA Program ("BASICs"); (b) obtain insurance coverage without increased costs associated with driver ratings or other such driver measurements or qualifications pertaining to drivers under CSA; and (c) be and remain competitive with similarly situated carriers with regard to quality of driver safety as measured under CSA. As part of the driver qualification process or, for an existing Contractor and such Contractor's already-Carrier-qualified drivers, upon request by Carrier, each of Contractor's drivers (including Contractor, if a driver) shall consent and authorize Carrier to access applicable driver files, SMS safety scores and other data, and FMCSA's Pre-

---

[1] "Carrier Policies and Procedures" comprise Carrier's "Drug and Alcohol Policy," "Passenger Program Policy Statement," and the Federal Motor Carrier Safety Regulations (see "Rules & Regulations" at www.fmcsa.dot.gov). Carrier shall furnish a paper copy of the Drug and Alcohol Policy and the Passenger Program Policy Statement to Contractor, at no charge, contemporaneously with the start of this Agreement, and during this Agreement, shall make these materials available to Contractor on request for inspection at a Carrier terminal during normal business hours at no charge. Carrier shall furnish a paper copy of any amendments to the Drug and Alcohol Policy or the Passenger Program Policy Statement to Contractor, at no charge, before the amendments go into effect. Contractor may, at Contractor's expense, inspect, download, and/or print the Federal Motor Carrier Safety Regulations by accessing (including, on request, at any Carrier terminal) FMCSA's "Rules & Regulations" web page indicated above.

Employment Screening System ("PSP") reports on such driver, both during the qualification process and at any time thereafter by immediately reviewing, signing, and returning to Carrier the "PRIVACY-RELATED DISCLOSURES AND CONSENT FORM," attached as Appendix E to the Agreement. Contractor further agrees to notify Carrier in writing within two (2) business days of receiving notification from the FMCSA that Contractor or any of Contractor's drivers have been deemed "unfit" or "marginal" based on their safety, inspection, and compliance performance.

**4(C)(3).    Communication    System /EOBR.** To help fulfill government highway-safety and other Applicable Law requirements imposed on Contractor's drivers (including Contractor, if a driver) and/or Carrier, including FMCSA's hours-of-service regulations, by monitoring and documenting such drivers' and their Equipment's compliance with highway-safety and other Applicable Law requirements, Contractor shall maintain in an operable condition in each unit of Contractor's Equipment a communications and electronic onboard recorder system ("Communication System/EOBR") that constitutes the Omnitracs, LLC, model then-currently designated by Carrier.

**4(C)(3)(a).    Furnishing of Unit.** *Except with respect to units of Equipment leased from CRST Lincoln Sales, Inc.,* (1) Contractor may elect to obtain, install in the Equipment, and maintain the above Communication System/EOBR, by initialing OPTION 1 in Section 3 of Appendix A **(Contractor Election Form)** or (2) Contractor may elect, by initialing OPTION 2 in Section 3 of Appendix A, to have Carrier arrange to have installed in the Equipment the Communication System/EOBR that constitutes the Omnitracs, LLC, model then-currently designated by Carrier. In the latter event, Contractor authorizes Carrier to deduct from Contractor's settlement compensation the installation fee and weekly rent in the amounts set forth in Section 4 of Appendix A. *For units of Equipment Contractor chooses to lease from CRST Lincoln Sales, Inc.,* which will have the Omnitracs, LLC, Communication System/EOBR installed in them, Contractor authorizes Carrier to deduct from Contractor's settlement compensation the weekly rent in the amount set forth in the Deductions Table of Section 4 of Appendix A. In all units of the Equipment, Contractor agrees to keep the Communication System/EOBR in an operable and functioning condition at all times that the Equipment is being operated in Carrier's service.

**4(C)(3)(b).    Network    Charge.** Whether the Communication System/EOBR is Contractor's or Carrier's, Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement a network charge in the amounts stated in Section 4 of Appendix A.

**4(C)(3)(c).    Re-Installation of Carrier-Furnished Communication System/EOBR.** In the event Contractor shall replace the unit(s) of

Equipment (tractor(s)), Carrier shall bear the expense of removal and re-installation of any Carrier-furnished Communication System/EOBR in Contractor's replacement Equipment.

**4(C)(3)(d).    Return    of    Carrier-Furnished Communication System/EOBR.** Contractor shall be responsible for the return of each Carrier-furnished Communication System/EOBR to Carrier immediately upon any request from Carrier or the termination of this Agreement, in accordance with Section 14 of this Agreement. A qualified technician selected by Carrier shall remove the Communication System/EOBR. If the Communication System/EOBR is lost, damaged as a result of Contractor's negligence, or not returned upon request or upon termination of this Agreement, Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement the entire expense incurred by Carrier in repairing or replacing the Communication System/EOBR, together with all collection costs. Carrier shall not be responsible for any loss or damage to Contractor's Equipment arising or resulting from the installation, use, or removal of the Carrier-furnished Communication System/EOBR.

**4(C)(3)(e).    Privacy-Related Disclosures and Consent Form.** The "Privacy-Related Disclosures and Consent Form," which is attached as Appendix E of this Agreement, describes the categories of data to be collected through the Communication System/EOBR; the uses to be made of such data by Carrier; and the right of Contractor and any Contractor's driver to review the collected data on request to Carrier, but only data relating to the requesting Contractor (including that Contractor's drivers) or the requesting driver, respectively. The form in Appendix E also includes a consent paragraph, as described in Section 4(C)(2) of the Agreement.

**4(C)(3)(f).    Use of Communication System/EOBR.** Contractor shall ensure that Contractor's drivers do not operate the voice, data, texting, or other features of any mobile phone or other communications device or system while driving, except in a health, safety, or security emergency.

**4(D).    Drivers.** Contractor shall provide competent professional drivers who meet Carrier's minimum driver qualification standards (part of Carrier's Policies and Procedures) and all Applicable Law. As part of the driver qualification process, Contractor and Contractor's drivers shall authorize Carrier to access applicable driver files.

**4(D)(1).    Medical Examinations.** Contractor acknowledges that DOT requires all drivers to undergo a complete medical examination prior to being allowed to drive, in any capacity whatsoever, in Carrier's motor carrier services. Such examination shall be performed and shall include testing for use of controlled substances and alcohol. Drivers may be required to take follow-up examinations, from time to time, in ac-

cordance with the requirements of 49 C.F.R. §§ 391.41 *et seq.* Additionally, if in the judgment of Carrier a further medical examination appears warranted, such examination shall be undergone. The expense of the initial medical examination for each of Contractor's drivers shall be the responsibility of Carrier; the expense of all subsequent medical examinations shall be the responsibility of Contractor.

4(D)(2). **Drug and Alcohol Testing.** As required by 49 C.F.R. §§ 382.103 and 382.601, Contractor and Contractor's drivers shall comply with Carrier's Drug and Alcohol Policy, including participation in Carrier's random drug and alcohol testing program, and any addendums or revisions thereto. Violation of Carrier's Drug and Alcohol Policy, or positive tests for prohibited drugs or alcohol, shall immediately disqualify Contractor's driver. Carrier shall bear the expense of all drug and alcohol tests.

4(D)(3). **Disqualification of Drivers.** Carrier shall have the right to disqualify any driver provided by Contractor in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law, in violation of Carrier's minimum qualification standards, or in violation of any policies of Carrier's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet Carrier's minimum qualification standards. Upon a driver's disqualification by Carrier, Contractor shall, if Contractor so chooses, furnish another competent, reliable, and qualified professional driver who meets Carrier's minimum qualification standards or this Agreement shall terminate immediately.

4(D)(4). **TWIC Requirement.** If a Contractor's driver lacks a Transportation Worker Identification Credential ("TWIC") from the Transportation Security Administration of the U.S. Department of Homeland Security when dispatched by Carrier to make a pickup or delivery at a port and therefore needs a suitably-credentialed escort, Contractor shall pay the fee charged by the escort.

4(E). **Driver Records.** Contractor shall regularly submit to Carrier all properly-completed driver log sheets within, as required by federal regulation (49 C.F.R. § 395.8(i)), thirteen (13) days following Contractor's completion of each log sheet and supporting documents (including original toll receipts for Carrier's reproduction), lumper (loader/unloader) receipts, trailer washout receipts, medical examination certificates, accident reports, DOT inspection documents, citations, Driver Vehicle Inspection Reports, and any other required data, documents, or reports. Contractor agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of Carrier or as authorized by Carrier, and shall indicate that the property transported is under Carrier's responsibility or that of a carrier to which the Equipment has been subleased.

4(F). **Passenger Authorization.** In accordance with 49 C.F.R. § 392.60(a), Contractor shall not allow any passengers (other than team co-drivers) to ride in the Equipment unless Carrier authorizes it in writing in advance. Carrier shall authorize Contractor to carry passengers (other than team co-drivers) only when one of the exceptions set forth in Sections 1(B)(1)-(10) of this Agreement to the team-driving requirement applies. Before Carrier shall give such authorization, Contractor, Contractor's driver, AND the passenger requesting authorization shall sign and submit to Carrier a fully executed release agreement pursuant to the "CRST, Inc. Passenger Program Policy Statement" available on request from Carrier. In addition, Contractor shall first obtain and maintain the passenger insurance coverage required by Section 10(B)(3) of this Agreement. **Contractor agrees not to permit any passenger to operate or be in charge of the Equipment at any time for any purpose whatsoever.**

4(G). **Paperwork Requirements.** Contractor shall submit to Carrier, on a timely basis, all properly completed, accurate, and legible driver logs and supporting documents (including originals or photocopies of toll receipts), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that Carrier requests proving Contractor has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(l), Carrier will keep the original of this Agreement with a copy to be maintained by Contractor, and a second copy to be carried in the Equipment during the term of this Agreement.

4(H). **Customer Requirements.** Contractor shall adhere to and perform, with respect to each shipment offered by Carrier under this Agreement, all service standards and other requirements of Carrier's customers that have been furnished to Contractor in writing, in hard-copy or electronic form, in advance of the shipment and that may reasonably be adhered to and performed without violating Applicable Law or endangering the public, the driver, and/or the property being transported. If Carrier's customer conditions Contractor's driver's access to facilities or freight upon the driver's passing the customer's own drug or alcohol tests or upon Contractor's or Contractor's drivers' meeting other personal-equipment or vehicular standards not imposed by Applicable Law, this Agreement, or Carrier Policies and Procedures, Contractor shall be free, and shall incur no Carrier sanction as a result, to reject the tests and/or standards and to refuse Carrier's offer of the customer's shipment.

5. **CONTRACTOR'S RESPONSIBILITIES.** Carrier and Contractor both recognize their relationship as one of CARRIER and INDEPENDENT CONTRACTOR and not of EMPLOYER and EMPLOYEE, respectively. Subject only to regulatory mandates, related Carrier policies, and customer requirements, it shall be the sole responsibility of Contractor to determine the manner and means of performing all of Contractor's services under this Agreement, including, but not limited to:

5(A). **Workers.** Selecting, setting the compensation, hours, and working conditions, adjusting any grievances, and supervising, training, disciplining, and firing all drivers, drivers' helpers, and other workers necessary for the performance of Contractor's obligations under this Agreement, provided that Contractor shall ensure that all such

drivers and other workers comply with the terms of this Agreement, including the requirements of safe operations and compliance with Carrier's safety policies and procedures while operating the Equipment on Contractor's behalf. No person Contractor may engage shall be considered Carrier's employee. Contractor alone shall pay any employment expenses for Contractor's workers, including but not limited to worker's compensation insurance, employment taxes, and all other benefits and pensions for the Contractor and Contractor's drivers, drivers' helpers, and other workers.

5(B).  **Equipment.**  Selecting, purchasing, and financing, and the Equipment and deciding when, where, and how maintenance and repairs are to be performed on the Equipment.  Contractor shall be free to substitute a different vehicle for the one constituting the Equipment, if each of the Contractor requirements of Section 1(A) of this Agreement is met and Carrier furnishes Contractor a new receipt covering the vehicle.  The substitute vehicle shall thereupon constitute the Equipment under this Agreement.

5(C).  **Routes and Completion of Performance.** Selecting all routes and refueling stops, provided that to meet customers' demands, Contractor agrees to make timely and safe deliveries of all loads, to notify Carrier when delivery has been made or when delivery will be delayed for any reason, and to be subject to Carrier's remedies for Contractor's nonperformance provided in Section 12 of this Agreement.

5(D).  **Loading.**  Loading and unloading freight onto and from the Equipment (if the shipper or consignee does not assume such responsibilities), with no additional compensation for this service except as provided in Appendix B (Contractor Compensation).

5(E).  **Use of Communications Equipment.** Contractor shall ensure that the contractor, or the contractor's drivers, does not operate the voice, data, texting, or other features of any mobile phone or other communications device or system while driving, except in a health, safety, or security emergency.

5(F).  **Operating Expenses.**  Paying all operating expenses, including, but not limited to, all expenses for fuel, oil, tires and other spare parts, supplies, and equipment necessary for the safe, efficient, and lawful operation and maintenance of the Equipment; road taxes, mileage taxes, fuel taxes, Federal heavy vehicle use tax, and state or local property or indefinite situs taxes; fines for parking, moving, or weight violations resulting, at least in part, from Contractor's acts or omissions; ferry, bridge, tunnel, and road tolls; any C.O.D. freight revenue collected by Contractor from shippers or others under this Agreement and not remitted to Carrier; towing; empty mileage; registration fees, base plates, licenses (and any unused portions of such fees, plates, or licenses),and  permits of all types (except as set forth in **Appendix B (Contractor Compensation)**); Contractors' drivers' or other workers' wages, employee benefits, insurance, pensions, employment taxes, advances, and any other levies or assessments based upon the operation of  Contractor's equipment for Carrier; with the following exceptions:

5(F)(1).    Detention and Accessorial Expense.  Contractor is responsible for detention expense and accessorial services expense except when Carrier, in its sole discretion, elects to bill and actually collects either type of expense from a customer, in which event Carrier shall pay Contractor the percentage of such amounts specified in Appendix B (Contractor Compensation);

5(F)(2).    Fuel and Mileage Tax Reporting.  Contractor is responsible for all state mileage and/or fuel taxes.

5(F)(2)(a).    If Contractor elects, by initialing Option 1 in Section 2(B)(2) of Appendix A (Contractor Election Form) or an addendum to this Agreement, to obtain  Contractor's own IFTA Fuel Tax Permit and perform Contractor's own fuel and mileage tax reporting, Contractor shall be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; and· shall indemnify, defend, and hold Carrier harmless against all claims arising out of or relating to such fuel tax reporting and payment.  If Contractor instead elects, by initialing Option 2 in Section 2(B)(2) of Appendix A, to have Carrier perform (directly or through an outside vendor) all fuel and mileage reporting on Contractor's behalf, Contractor hereby agrees that:

5(F)(2)(a)(1).    To facilitate the parties' compliance with the various states' tax reporting and payment requirements (which generally hold the motor carrier liable if an independent vehicle operator performing transportation services on the carrier's behalf fails to make the required tax payments), Carrier shall be deemed to be the reporting entity with respect to the Equipment and the fuel consumed by said Equipment. In such event, Carrier shall settle with Contractor monthly and submit quarterly, in Contractor's name as indicated herein, as to all the applicable reports and payments of fuel taxes required of it by the taxing bodies and authorities of the appropriate states, provinces, and other governmental bodies with respect to the Equipment operated under this Agreement. To assist in Carrier's computing and payment of fuel taxes, it shall issue Contractor an advance card for each of Contractor's drivers that may be used for fuel purchases ("CRST Advance Card"). Contractor and Contractor's drivers are free not to use Carrier's Advance Card but, to the extent they choose not to, Contractor shall provide Carrier promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state. In addition, if Contractor's Equipment lacks an Omnitracs, LLC, Communications System/EOBR (as defined in Section

4(C)(3)), Contractor shall submit to Carrier for each trip a full-size trip sheet (obtainable at any of Carrier's terminals) listing origin, destination, states, routes, and miles traveled. Making quarterly computations,

5(F)(2)(a)(2). Carrier shall submit, in its own name, all required reports and payments of fuel and mileage taxes owed with respect to the Equipment under this Agreement and shall (a) deduct from Contractor's settlements, in installments of up to one hundred dollars ($100), or otherwise recover pursuant to Section 6(A), any net fuel or mileage tax owed at that time with respect to Contractor's operations in all taxing jurisdictions combined or (b) credit to Contractor's next settlement any net fuel or mileage tax credit or refund due Contractor at that time with respect to Contractor's operations in all taxing jurisdictions combined. Carrier shall provide Contractor with at least quarterly summaries of credits and debits for fuel and mileage taxes on a state-by-state basis either on Contractor's settlement sheets or through separate accountings, at Carrier's option.

5(F)(2)(a)(3). Ordinarily Carrier shall compute Contractor's fuel use and mileage taxes on a fleetwide average basis. If, however, Contractor fails to provide Carrier complete and accurate fuel-tax-related records, as required by the fourth sentence of Section 5(f)(2)(a)(1) of this Agreement, in time for Carrier's computation, on the seventh (7th) day of each month, of Carrier's fuel and mileage tax reports and payments for the preceding month, Carrier shall compute Contractor's fuel use taxes based on total miles dispatched by Carrier at a rate of five (5) miles-per-gallon.

5(F)(3). Overweight and Over-Dimensional Fines. Carrier shall reimburse Contractor for any overweight or over-dimension fine or any fine resulting from improperly permitted over-dimension or overweight load, when said fine is paid by Contractor with respect to pre-loaded, sealed, or containerized loads or where the trailer, container, or lading was outside the control of Contractor, provided that, Contractor checked the weight on all axles of the load at the shipper's location (submitting to Carrier a shipper-produced scale ticket) or at the first reasonably-available government-certified scale (submitting to Carrier a government-certified scale ticket), checked the dimensions of the load and Equipment prior to transport, and informed Carrier dispatch of any discovered overweight or over-dimension violations.

5(G). Base Plates and Permits.

5(G)(1). Base Plates. Obtaining, and properly displaying on the Equipment, the license base plates necessary to operate the Equipment lawfully on Carrier's behalf. If Contractor chooses to have Carrier obtain the base plates and deduct or otherwise recover pursuant to Section 6(A) of this Agreement the expense from Contractor's settlement compensation, Contractor shall so indicate in Section 2(A) of Appendix A (Contractor Election Form).

5(G)(2). Permits. Ensuring that all permits and licenses necessary for him/her to operate the Equipment lawfully on Carrier's behalf have been obtained, at Contractor's expense, as detailed in Section 2(B) of Appendix A (Contractor Election Form).

5(H). Use of Carrier's Trailer(s). For every trailer, chassis, or other trailing equipment provided by Carrier for Contractor's use ("Carrier's Trailer"), Contractor shall, while using or otherwise in possession of Carrier's Trailer, be responsible for—and pay—a weekly usage charge to Carrier in an amount set forth in the Deductions Table in Section 4 of Appendix A (Contractor Election Form), which Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement; be responsible for daily pre-trip and post-trip inspections; proper inflation of tires; prompt informing of Carrier upon experiencing defective or mal-performing tires, brakes, or other electrical or mechanical features of Carrier's Trailer; proper lubrication at Contractor's expense; and, subject to the indemnity limit in Section 7(B) of this Agreement, all repairs of all damage to Carrier's Trailer other than ordinary wear and tear, and Contractor hereby authorizes Carrier to deduct or otherwise recover all these amounts pursuant to Section 6(A) of this Agreement. Contractor agrees to return any Carrier's Trailer in the same good condition as received by Contractor, reasonable wear and tear excepted, along with any and all other equipment and property belonging to Carrier immediately upon Carrier's request or upon termination of this Agreement. If the trailer is not in as good as condition (reasonable wear and tear excepted) as when it was delivered by Carrier, Contractor hereby authorizes Carrier to restore the trailer to proper condition and to charge back to Contractor the costs of these repairs or reconditioning. If Contractor for any reason fails to comply with this provision and return Carrier's Trailer, Contractor agrees to reimburse Carrier for all reasonable expense, including attorneys' fees, incurred by Carrier in recovery of Carrier's Trailer. Contractor shall be liable for, and pay, the entire amount, subject to the indemnity limits in Section 7(B) of this Agreement, for each incident involving damage, including but not limited to, repairs, storage while awaiting repair, towing or moving expense, and replacement costs for a total loss, arising out of, or in connection with, Contractor's use of Carrier's Trailers, Carrier's customer's trailers, other Carrier equipment, or equipment of any other carrier. Before deducting any such damage from Contractor's compensation, Carrier shall provide Contractor with a written explanation and itemization of the deduction. Contractor agrees and warrants that any trailer provided for use by Carrier will be used by Contractor and Contractor's drivers to transport only shipments tendered to Contractor by Carrier.

6. CHARGE-BACKS.

6(A).   Deductions Table.  Contractor hereby authorizes Carrier to charge back or deduct -- from Contractor's gross compensation under Section 2 of this Agreement, from Contractor's Escrow Funds (to the extent provided under Section 8 of this Agreement), or from other amounts Carrier owes to Contractor at the time of settlement with Contractor -- amounts that, under this Agreement or any addendum, Contractor owes to Carrier, as set forth in the Deductions Table in Section 4 of Appendix A (Contractor Election Form) of this Agreement, resulting in a net amount, if any, to be remitted to Contractor ("Settlement Compensation").  If Contractor's settlement compensation proves insufficient, Contractor hereby authorizes Carrier to deduct such items from Contractor's Escrow Fund established under Section 8 of this Agreement.  Where no dollar figure is listed in the Deductions Table, the deductions will vary in amount and shall be computed as indicated in the column headed "Amount of Deduction or Method of Computation" or in Section 4 of Appendix A (Contractor Election Form) or in an addendum to this Agreement.   Except as otherwise indicated in that column, (a) Carrier shall charge Contractor no administrative ("admin.") fee or markup and (b) Carrier shall credit Contractor with all rebates, discounts, credits, or refunds that correspond to particular chargebacks or deductions and that Carrier receives while this Agreement is in effect or, in the case of taxes and fees, even after this Agreement is terminated.  Instead of or in addition to making the deductions authorized by this Section or other provisions of this Agreement and any addendum, Carrier shall have a right to recover, through collection agencies, the right of setoff, and all other available legal means, any such amounts Contractor owes, or comes to owe, Carrier under this Agreement.

6(B).   Information Regarding Deductions.  Carrier shall provide Contractor with a written explanation and itemization of any deductions for cargo or property damage before making them.  With respect to all charge-backs and deductions, Carrier shall make available to Contractor, upon request, copies of those documents that are necessary to determine the validity of the charge-back or deduction.

6(C).   Changes in Existing Deduction Items.  If any deduction item, amount, or method of computation on the Deductions Table in Section 4 of Appendix A (Contractor Election Form) will be changing, whether at Contractor's request or on Carrier's initiative, Contractor shall be so notified by personal delivery, fax, other written notice, or, if the parties have both signed Appendix D (Consent to Conduct Business by Electronic Methods), by appropriate electronic means outlined in that Appendix.  Such modified items, amounts, or methods shall replace and supersede those shown in the Deductions Table that appears in Section 4 of Appendix A (Contractor Election Form).  A change shall not take effect until twenty (20) days after the notice is deemed given under Section 13 of this Agreement or such later time as is stated on the notice. Contractor's failure, by the end of 20-days after such notice, to notify Carrier of any objection to the change shall constitute Contractor's express consent and authorization to Carrier to implement the change and modify accordingly the amount deducted or otherwise recovered from Contractor pursuant to Subsection (A) of this Section or the Deductions Table in Section 4

of Appendix A (Contractor Election Form), beginning immediately after the 20-day period.  If Contractor fails to notify Carrier of an objection within the 20 day period -- or if Contractor notifies Carrier in writing of any objection within the 20-day period stated in Section 13 of this Agreement and the parties are then unable to resolve the matter, the change shall be rescinded as to Contractor back to its effective date (with any necessary credit or deduction made on Contractor's next settlement sheet) and the parties shall each have the right to terminate this Agreement immediately thereafter.   Even after the twenty-day period, Contractor retains Contractor's right to terminate this Agreement in accordance with the procedures set forth in Section 14 of this Agreement, although Contractor shall remain subject to the change from the effective date of the change until the effective date and time of the termination of this Agreement.

6(D).   No Required Purchases from Carrier. Contractor is not required to purchase or rent any products, equipment, or services from Carrier or its affiliates as a condition of entering into this Agreement.

7.   INDEMNIFICATION AND HOLD HARMLESS.

7(A).   In General.  Except to the extent Contractor's acts or omissions are covered under the parties' respective insurance policies as set forth in Section 10 of this Agreement and Appendix A (Contractor Election Form) with no expense to Carrier, Contractor agrees to defend, indemnify, and hold Carrier harmless from any claim of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that Carrier pays or otherwise incurs arising out of or in connection with Contractor's (including Contractor's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement any amounts due Carrier under Paragraph 1 of this Subsection.  Carrier shall furnish Contractor with a written explanation and itemization of any deduction for cargo or property damage before the deduction is made.  If Contractor operates the Equipment for any purpose other than the carriage of Carrier's lading, Contractor shall hold Carrier harmless and indemnify Carrier for any damage (including attorneys' fees) arising from such use.  This Subsection shall remain in full force and effect both during and after the termination of this Agreement.

7(B).   Indemnity Limits.  Contractor's indemnity obligations under Subsection (A) of this Section shall be limited as follows:

7(B)(1).   With respect to claims of personal injury (including death) or damage to the property of third-parties, Contractor shall have no indemnity obligation to Carrier under Section 7(A).

7(B)(2).   With respect to claims of cargo loss, damage, or delay, including clean-up ex-

penses incurred by Carrier in connection with such loss, damage, or delay, Contractor's indemnity obligation under Section 7(A) shall be limited to a maximum of Seventy-Five Thousand Dollars ($75,000) of the total amount in Damages that Carrier paid or otherwise incurred per occurrence.

7(B)(3).    With respect to claims of loss of or damage to Carrier's Trailer or other Carrier property, including towing expenses incurred by Carrier, Contractor's indemnity obligation under Section 7(A) shall be limited to a maximum of Seventy-Five Thousand Dollars ($75,000) of the total amount in Damages that Carrier paid or otherwise incurred per occurrence.

7(B)(4).    The amounts specified above shall include the expense of any defense thereof up to the maximum liability amount as set forth in each case herein.

7(B)(5).    The above indemnity limits set forth in Paragraphs 1, 2, and 3 of this Subsection shall not apply to Subsections D or E of this Section or to:

7(B)(5)(a).    Loss or damage resulting from accidents or other causes whenever the Equipment is not being operated on behalf of Carrier,

7(B)(5)(b).    Loss or damage resulting from injuries to Contractor or any of Contractor's drivers, drivers' helpers, or other workers whenever the Equipment either is, or is not, being operated on behalf of Carrier,

7(B)(5)(c).    Loss or damage to the Equipment or Contractor's other property whenever the Equipment either is, or is not, being operated on behalf of Carrier.

7(C).    Carrier's Coverage. Carrier has secured certain insurance policies and coverages directly relevant to certain risks and liabilities for which Contractor has agreed to indemnify Carrier under this Subsection (for example, automobile liability, general liability, and cargo liability arising out of or in connection with Contractor's (including Contractor's agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions). Such policies are expressly for the benefit of Carrier and incidentally may benefit Contractor. Terms of such policies may change (for example, higher or lower deductibles, length of coverage, UM/UIM waivers or limitations, or insurance underwriters). Contractor has neither any obligations under the policies nor any right to change the terms of coverages.

7(D).    Claims by Contractor or Other Contractors. Notwithstanding Subsection A of this Section and not subject to the limits of Subsection B of this Section, Contractor agrees to defend, indemnify, and hold Carrier harmless from any claim by Contractor of loss of or

damage to the Equipment or Contractor's other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of Contractor or any other contractor of Carrier (including agents or employees of Contractor or any other contractor of Carrier, respectively); and from any claim by any other contractor of Carrier of loss of or damage to such other contractor's truck, tractor, trailer, or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of Contractor (including Contractor 's agents or employees).

7(E).    Reclassification. SECTION 9(F) AND OTHER PROVISIONS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS, AND BOTH CONTRACTOR AND CARRIER INTEND CONTRACTOR TO BE, AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE OF CARRIER. IN LIGHT OF THIS FACT AND INTENT: Notwithstanding Subsection A of this Section and not subject to the limits of Subsection B of this Section, Contractor agrees to indemnify and hold Carrier harmless from all reasonable attorney's fees and litigation expenses Carrier incurs in defending against any claims, suits, actions, or administrative proceedings brought by Contractor, Contractor's owner (if any), or any employees or other personnel engaged by Contractor to perform services under this Agreement -- or, at Contractor's instance or with Contractor's consent, by any union or other private organization or member of the public – that allege that Contractor or any of Contractor's workers is an employee of Carrier, but fail to result in any final (upon completion of all appeals or the running of all applicable appeal periods) judicial or administrative decision holding the allegation to be true.

7(F).    Indemnification by Carrier.    Carrier agrees to defend, indemnify, and hold Contractor harmless from any claim (including any for which Contractor is not indemnified by Carrier's insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that Contractor pays or otherwise incurs arising out of or in connection with Carrier's (including Carrier's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. This indemnification shall not apply to any claim of loss or damage to the Equipment or to Contractor's other property or to any claim arising out of or in connection with Contractor 's operation of the Equipment for any purpose other than the performance of Contractor's obligations under this Agreement. Contractor shall furnish Carrier with a written explanation and itemization of any claim for cargo or property damage. Carrier's indemnity obligation under this Subsection (F) shall, if involving Carrier's (including Carrier's agents' or employees') negligence, be limited to a maximum of One Thousand Five Hundred

Dollars ($1,500) of the total amount in Damages that Contractor paid or otherwise incurred per occurrence. This dollar limit shall not apply to Damages arising out of or in connection with such claims if involving Carrier's (including Carrier's agents' or employees') gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. Carrier shall credit to Contractor's next Settlement Compensation any amounts due Contractor under this Section from Carrier. This Section shall remain in full force and effect both during and after the termination of this Agreement.

8. ESCROW FUNDS. Contractor authorizes Carrier, and Carrier agrees, to establish and administer as required escrow funds a General Escrow Found and a Maintenance and Other Reserve Fund (together, "Escrow Funds"), both of which Contractor and Carrier agree shall be governed by the following terms and conditions.

### 8(A).  Principal.

8(A)(1).  General Escrow Fund. As the minimum principal to be held in the General Escrow Fund, Carrier shall deduct from Contractor's settlement compensation and deposit in this Fund the Principal Amount stated in Section 8(A) of Appendix A (Contractor Election Form), at the flat weekly rate stated therein, beginning the first week of services provided by Contractor under this Agreement. If, at any time, the balance in the General Escrow Fund falls below the Principal Amount, Contractor authorizes Carrier to resume the weekly deductions until the full principal amount is replenished.

8(A)(2).  Maintenance and Other Reserve Fund.

8(A)(2)(a).  Minimum Principal. As the minimum principal to be held in the Maintenance and Other Reserve Fund, Carrier shall deduct from Contractor's settlement compensation and deposit in this Fund the Principal Amount stated in Section 8(B)(1) of Appendix A (Contractor Election Form), at the Principal cents-per-mile rate stated therein, beginning the first week of services provided by Contractor under this Agreement. If, at any time, the balance in this Fund falls below the Principal Amount, Contractor authorizes Carrier to resume the weekly deductions until the full principal amount is replenished.

8(A)(2)(b).  Additional Principal. If Contractor elects to continue building the Maintenance and Other Reserve Fund once the Principal Amount has been fully deposited, Contractor shall initial OPTION 1 in Section 8(B)(2) of Appendix A (Contractor Election Form) and specify therein an Additional Principal Amount (over and above the Principal Amount) and an Additional Principal cents-per-mile. Carrier shall then make weekly deductions from Contractor's settlement compensation at this latter rate, and corresponding deposits in the Fund, until the sum of the Principal Amount

and Additional Principal Amount is reached or if, Contractor does not initially specify an Additional Principal Amount, until Contractor does so by written notice to Carrier. If, at any time, the balance in this Fund falls below the sum of the Principal Amount and Additional Principal Amount (but above the minimum Principal Amount), Contractor hereby authorizes Carrier to resume the weekly deductions until such sum is replenished. Contractor may discontinue or change the Additional Principal Amount or the deduction rate at any time by written notice to Carrier.

8(B).  Specific Items to Which Escrow Funds May Be Applied. The Escrow Funds shall be held by Carrier to guarantee the performance of Contractor's obligations under this Agreement (including any addendum). Specifically –

8(B)(1).  General Escrow Fund. This Fund shall apply to all deduction items set forth in the Deductions Table in Section 4 of Appendix A (Contractor Election Form) and any addendum ("Escrow Items").

8(B)(2).  Maintenance and Other Reserve Fund.

8(B)(2)(a).  During the Agreement. This Fund shall apply, during the Agreement, to the extent of all Principal and Additional Principal available, to all maintenance, repair, and tire-related Escrow Items and thereafter, to the extent any Additional Principal remains, all other expenses related to the operation of the Equipment under this Agreement (not including personal and household expenses) for which Contractor asks Carrier orally, followed by a written request, for a disbursement.

8(B)(2)(b).  Upon Termination of the Agreement. This Fund shall apply, upon termination of the Agreement, to all Escrow Items.

8(C).  Accountings. While the Escrow Funds are under Carrier's control, Carrier shall provide an accounting to Contractor, no less frequently than monthly and separately for each Escrow Fund, on Contractor's settlement sheets or separately, of all transactions involving the Escrow Funds, including the amount and description of any deduction from or addition to the General Escrow Fund or the Maintenance or Other Reserve Fund. In addition, upon Contractor's request at any time, Carrier shall provide Contractor with an accounting of any transactions involving the Escrow Funds.

8(D).  Interest. Carrier shall pay interest to Contractor on the Escrow Funds, separately, on a quarterly basis ("interest period") beginning with receipt of the first Contractor contribution of principal. The interest rate shall be established on the date the interest period begins and shall be equal to the average yield, or the equivalent coupon issue yield, whichever is lower, of 91-day, 13-week U.S.

Treasury bills, as established in the weekly auction by the Department of the Treasury.

**8(E).   Final Settlement.**   At the time of the return of any remaining balance in the Escrow Funds, Carrier may deduct monies for all Escrow Items. Such deductions shall be limited to amounts Carrier actually spends, incurs, or owes to a third party, or that Contractor owes to Carrier or a third party under a purchase or rental contract, before termination of this Agreement or, with respect to any Contractor obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by Carrier in seeking the return of its identification devices and other property, all amounts Carrier actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter. Carrier shall not make deductions from the Escrow Funds for items for which, by the end of forty-five (45) days after termination, neither Contractor nor Carrier has yet made an expenditure or incurred a quantified, legally binding obligation to pay. Carrier shall provide a final accounting to Contractor of all such final deductions made from the Escrow Funds within forty-five (45) days from the date of termination of this Agreement.

**8(F).   Return Of Escrow Balance.**   In no event shall the Escrow Funds, less any final deductions pursuant to Subsection 8(E) of this Section, be returned to Contractor later than forty-five (45) days from the date of termination of this Agreement. Carrier's use, or post-termination return to Contractor, of any balance in the Escrow Funds shall not constitute a waiver of Carrier's right to recover, through any available lawful means, any additional amounts Contractor owes, or comes to owe, Carrier under this Agreement.

## 9.   CONTRACTOR NOT EMPLOYEE OF CARRIER.

**9(A).   In General.**   It is understood and agreed that Contractor is an independent contractor for the Equipment and driver services provided pursuant to this Agreement.

**9(B).   Certification of Status.**   Contractor shall provide necessary documentation and apply for certification of Contractor's independent-contractor status where mandated by applicable state law, including but not limited to, the State of South Dakota (where, if Contractor is domiciled in that State, Contractor shall successfully complete and submit to the proper authorities an Independent Contractor Verification Application, SD E-Form 1658).

**9(C).   Selection of Equipment, Maintenance, and Routes.**   Subject only to all Applicable Law and safety considerations, it shall be the sole financial responsibility of Contractor to select, purchase or lease, and finance the Equipment; to decide when, where, and how maintenance and repairs are to be performed on the Equipment; and to select all routes and decide all meal, rest, and refueling stops, provided that to meet Carrier's customers' demands, Contractor agrees to make timely and safe deliveries of all loads, and also agrees to notify Carrier when delivery has been made or when delivery will be delayed for any reason.

**9(D).   Contractor's Workers.**   Subject again only to all Applicable Law and safety considerations, Contractor

hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation insurance (or, if Contractor prefers, occupational accident insurance where both state law allows and Carrier approves), adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of Contractor's use or employment of drivers, drivers' helpers, and other personnel to perform any aspect of this Agreement. No person Contractor may engage shall be considered Carrier's employee. Contractor shall be solely responsible for complying with any and all state, federal, local, and foreign laws applicable to the terms and conditions of employment of Contractor's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the Contractor purchases a license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and, other required withholdings for Contractor's employees. Contractor's performance of these responsibilities shall be considered proof of Contractor's status as an independent contractor in fact.

**9(E).   Taxes.**

**9(E)(1).   Contractor's Form of Business and Agreement to File Returns and Pay Taxes.**   As an independent contractor, Contractor is free to choose the form in which to operate Contractor's business. Contractor shall file all federal, state, local, and foreign income, withholding, employment, and federal heavy vehicle use tax forms and returns that Contractor may be required by law to file, on account of Contractor and all drivers, drivers' helpers, and other workers used by Contractor in the performance of this Agreement at the time and place that may be specified in the applicable federal, state, local, and foreign laws, and to pay when due all taxes and contributions reported in such forms and returns. In that regard, Contractor knows:

**9(E)(1)(a).   Of Contractor's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from Carrier;**

**9(E)(1)(b).   That the social security tax Contractor must pay is higher than the social security tax the individual would pay if he or she were an employee; and**

**9(E)(1)(c).   That the service provided by Contractor to Carrier pursuant to the Agreement is not work covered by the unemployment compensation laws of any state, including Georgia; provided, however, that should Contractor employ or use drivers, helpers, or other workers to fulfill Contractor's obligations under the Agreement, and such drivers, helpers, or other workers are covered by the unemployment laws of any state, including**

Georgia, Contractor is solely responsible for providing unemployment insurance for such drivers, helpers, or other workers.

9(E)(2). **Access to Contractor's Tax Records.** Contractor agrees to furnish Carrier such evidence of compliance with the foregoing as Carrier shall reasonably require, including but not limited to proof of income and payroll taxes currently paid by Contractor (including as provided in Paragraph 2 of this Subsection) or withheld by Contractor from the wages of Contractor's drivers and other workers.

9(E)(3). **Carrier's Filing of IRS Form 1099.** Carrier shall, itself or through an agent, file federal income tax IRS Form 1099s with the Internal Revenue Service with respect to Contractor if the amount of compensation Carrier pays Contractor during a calendar year reaches the level at which federal law requires such forms to be filed.

9(F). **The Parties' Financial Obligations If Contractor is Determined to Be an Employee.** If, whether on Contractor's initiative or not, Contractor is declared to be an employee of Carrier by any federal, state, local, or foreign court, administrative agency, or other governmental body ("Reclassification Decision"), Contractor and Carrier hereby agree that this Agreement shall be rescinded back to the time of its formation and that both parties shall be returned to their respective positions before this Agreement was signed. Specifically, Contractor and Carrier agree that notwithstanding any other provision of this Agreement:

9(F)(1). Contractor shall, upon the Reclassification Decision becoming final and no longer appealable, immediately (a) owe Carrier, for each week or other period this Agreement was in effect, all gross compensation under Section 2 of this Agreement and Appendix B, less any charge-backs under Section 6(A) of this Agreement, previously paid to Contractor by Carrier; (b) shall relinquish all rights in any balances in escrow funds then under Carrier administration that are traceable to compensation previously paid to Contractor by Carrier; and (c) shall owe Carrier any cash advances provided by Carrier to Contractor that Contractor used for personal, household, or other expenses not in performance of Contractor's obligations under this Agreement or that Contractor retained unspent. Contractor shall be entitled to deduct from those amounts any expenses (including, for Equipment, other equipment, or tools used in performing work for Carrier, any actual rent or installment-purchase payments made by Contractor or, if none, payments that would equal fair-market rent for items of similar kind, age, and condition) Contractor incurred in performance of Contractor's obligations under this Agreement that were not covered by charge-backs or paid by Carrier;

9(F)(2). Carrier shall, upon the Reclassification Decision becoming final and no longer appealable, immediately owe Contractor, for all work activities during each week or other period this Agreement was in effect (including any activities for which Carrier has not yet paid Contractor), only the then-applicable federal minimum hourly wage or, if higher, a State's then-applicable minimum hourly wage but only to the extent Contractor's wage-earning activities occurred in that State, multiplied by Contractor's total hours actually performing on-duty work for Carrier, consisting of both driving and non-driving time, under the FMCSA Hours of Service Regulations, 49 C.F.R. Part 395, or under a State's hours of service regulations to the extent applicable. The total hours worked shall be computed based on any relevant, reliable evidence, which may include estimates or projections based on Settlement Statements, driver logs, shipment and/or vehicle tracking data, bills of lading, fuel receipts, toll receipts, and testimony; and

9(F)(3). Because reclassification of Contractor's status from independent contractor to employee would fundamentally change the parties' contracting assumptions and expectations, either party may, immediately upon initial issuance (even if appealed or appealable) of a Reclassification Decision, terminate this Agreement on one day's notice to the other. The provisions of this Subsection shall be deemed to survive any termination of this Agreement.

10. **INSURANCE.**

10(A). **Carrier's Insurance Obligations.** Pursuant to FMCSA regulations (49 C.F.R. Part 387) promulgated under 49 U.S.C. § 13906 and applicable state laws, Carrier shall maintain public liability insurance (personal-injury/property-damage coverage and environmental restoration coverage) and cargo insurance in at least such amounts as are required by, covering the Equipment at all times the Equipment is being operated on behalf of Carrier. Carrier's possession of such insurance, however, shall in no way restrict its rights of indemnification against Contractor as provided for in Section 7 of this Agreement.

10(B). **Contractor's Insurance Obligations.** Contractor shall maintain, at its sole expense, the following minimum insurance coverages during this Agreement:

10(B)(1). **Non-Trucking (Bobtail) Liability Insurance.** Contractor shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to Contractor whenever the Equipment is not being operated on behalf of Carrier in a combined single limit of not less than five hundred thousand dollars ($500,000), with a deductible no greater than one thousand dollars ($1,000), for injury or death to any person or for damages to property in any one occurrence. Such coverage shall be no less comprehensive than the coverage Carrier shall facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 5 of Appendix A (Contractor Election Form). In addition, the required coverage shall be primary to any other insur-

ance that may be available from Carrier. Contractor shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**10(B)(2).  Workers' Compensation/ Occupational Accident Insurance.**

**10(B)(2)(a).** <u>Worker's Compensation Coverage.</u>  If domiciled in one of the following states: Colorado, Massachusetts, Nevada, New Hampshire, New Jersey, New York, North Carolina, and South Carolina or any state that requires such coverage, Contractor shall provide workers' compensation insurance coverage on Contractor and shall provide Workers' Compensation Coverage in all states on those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state. In lieu of Workers' Compensation Coverage, Carrier may accept Occupational Accident Coverage for any Contractor who lives in the above outlined states; however, approval of such coverage shall be on a case-by-case basis and at the sole discretion of Carrier.

**10(B)(2)(b).** <u>Kansas, Mississippi, and Utah.</u>

**10(B)(2)(b)(1).  Kansas and Mississippi.**  If Contractor is domiciled in Kansas or Mississippi, Contractor shall provide occupational accident insurance coverage of at least $1 million on Contractor and workers' compensation insurance coverage on those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state;

**10(B)(2)(b)(2).  Utah.**  If Contractor is domiciled in Utah and is the sole owner (as that term is defined in 49 C.F.R. § 376.2(d)) and exclusive driver of the Equipment, Contractor shall provide Carrier with evidence, in the form required by Subsection C of this Section, of occupational accident insurance coverage and a copy of a valid Workers' Compensation Coverage Waiver ("WCCW") issued by the Industrial Accidents Division of the Utah Labor Commission (through the application online at https://webaccess.laborcommission.utah.gov/wccoveragewaivers).  If Contractor is domiciled in Utah and is not the sole owner and exclusive driver of the Equipment, Contractor shall provide evidence, in the form required by Subsection C of this Section, of workers' compensation insurance coverage on both Contractor (unless Contractor has provided Carrier with a copy of a valid WCCW) and those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of Utah;

**10(B)(2)(c).** <u>Other States.</u>  If domiciled in any other state, Contractor shall provide workers' compensation insurance coverage for those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state;

**10(B)(2)(d).** <u>Workers' Compensation Coverage Details.</u>  Workers' compensation coverage, where required by the above paragraphs, shall be in amounts not less than the statutory limits required by the applicable state's law. The worker's compensation insurance policy shall provide principal coverage in Iowa and, if different, the state in which Contractor is domiciled (which state, if Contractor is a resident of North Carolina, shall be deemed to be North Carolina), and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming. If Contractor is domiciled in any of the four foregoing states, Contractor shall have state-fund coverage. As evidence of such coverage, Contractor shall provide Carrier with a copy of the insurance policy declarations page for Carrier's verification before operating the Equipment under this Agreement.

**10(B)(2)(e).** <u>Occupational Accident Coverage.</u>  Occupational accident insurance policy, where required or permitted by the above paragraphs, shall include either an endorsement or a separate policy provision whereby an admitted insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by Contractor alleging employee status. The occupational accident insurance coverage must be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 6 of **Appendix A (Contractor Election Form)**, and only if Carrier approves the coverage.

**10(B)(3).** <u>Passenger Insurance.</u>  If Contractor wishes to carry passengers ten years old or older in the Equipment (subject to Carrier so authorizing in advance pursuant to Section 4(F) of this Agreement), Contractor shall first procure, carry, and maintain passenger liability insurance that shall provide coverage to Contractor whenever the Equipment is being operated (whether or not on behalf of Carrier) for injury or death to any person riding as a passenger in the Equipment in a combined single limit of not less than fifty thousand dollars ($50,000) benefit for accidental death, dismemberment, and paralysis for children ages ten through seventeen years old and not less than one hundred thousand dollars ($100,000) for individuals more than seventeen years old; not less than one hundred thousand dollars ($100,000) for accident medical benefit over a 52-week benefit period; not less than one hundred fifty dollars ($150) per tooth and one thousand dollars ($1,000) maximum per accident dental benefit; and not less than five hundred thousand dollars ($500,000)

aggregate limit of liability per occurrence, and with no deductible. Such coverage shall be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses, as provided in the "CRST Passenger Accident Program Enrollment Form and Certificate of Insurance" available upon request from Carrier. In addition, such coverage shall be primary to any other insurance that may be available from Carrier. Contractor shall be responsible for any loss or damage in excess of the policy limits.

10(B)(4).  Other Insurance.  In addition to the insurance coverages required under this Agreement, it is solely Contractor's responsibility to procure, carry, and maintain any fire, theft, uninsured and/or underinsured motorist, physical damage (collision), or other insurance coverage that Contractor may desire for the Equipment, for any satellite equipment Contractor leases from Carrier, or for Contractor's health care or other needs.  **As provided in Section 7 of this Agreement, Contractor holds Carrier harmless with respect to loss of or damage to Contractor's Equipment, trailer, or other property, and Carrier has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to Contractor's Equipment, trailer, or other property. Contractor acknowledges that Carrier may, and Contractor hereby authorizes Carrier to, waive and reject no-fault, uninsured, and underinsured motorist coverage from Carrier's insurance policies to the extent allowed under Iowa law (or such other state law where the Equipment is principally garaged), and Contractor shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.**

10(B)(5).  **Cargo, Carrier's Trailer(s), and Related Expenses.** Contractor shall procure, carry, and maintain insurance coverage for cargo loss, damage, or delay, including clean-up expenses incurred in connection with such loss, damage, or delay, and insurance coverage for loss or damage to Carrier's Trailer(s) or other Carrier property, including towing expenses incurred in connection with such loss or damage, in a combined single limit of not less than seventy-five thousand dollars ($75,000) with a deductible no greater than one thousand five hundred dollars ($1,500). Such coverage shall be no less comprehensive than the coverage Carrier shall facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 5 of Appendix A (Contractor Election Form). In addition, the coverage shall be primary to any other insurance that may be available from Carrier. Contractor shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

10(C).  **Requirements Applicable To All Of Contractor's Insurance Coverages.**  Contractor shall procure insurance policies providing the above-described required coverages solely from properly-licensed insurance carriers that are A.M. Best "A"-rated (or of equivalent financial strength in the commercially-reasonable judgment of Carrier), and Contractor shall not operate the Equipment under

this Agreement unless and until Carrier has determined that the policies are acceptable (Carrier's approval shall not be unreasonably withheld).  Contractor shall furnish to Carrier written certificates obtained from Contractor's insurance carrier or carriers showing that all coverages required by this Agreement have been procured from such insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid.  Each insurance certificate shall specify the name of the insurance carrier, the policy number, the effective date and expiration date, and the amounts and types of coverage; list Carrier as an additional insured with primary coverage, and show that written notice of cancellation or modification of the policy shall be given to Carrier at least thirty (30) days prior to such cancellation or modification. If a certificate of insurance provided to Carrier under this Subsection does not show that written notice of cancellation or modification of the policy shall be given to Carrier at least thirty (30) days prior to such cancellation or modification, Contractor shall provide, or cause its insurance carrier to provide, such notice to Carrier.

10(D).  **Contractor's Liability If Required Coverages Are Not Maintained.  In addition to Contractor's indemnity obligations to Carrier under Section 7 of this Agreement, Contractor agrees to defend, indemnify, and hold Carrier harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that Carrier may incur arising out of or in connection with Contractor's failure to maintain the insurance coverages required by this Agreement. In addition, Contractor, on behalf of Contractor's insurer, expressly waives all subrogation rights against Carrier, and, in the event of a subrogation action brought by Contractor's insurer, Contractor agrees to defend, indemnify, and hold Carrier harmless from such claim.**

10(E).  **Availability Of Insurance Facilitated By Carrier.**

10(E)(1).  **Contractor May Opt for Insurance Facilitated by Carrier.**  Contractor may, if he/she so chooses by initialing one or more boxes in the right-hand column of the "CERTIFICATE OF INSURANCE" table in Section 6 of Appendix A (Contractor Election Form) (or, for passenger liability coverage, by completing a "CRST International Passenger Accident Program Enrollment Form and Certificate of Insurance") authorize Carrier to facilitate on Contractor's behalf the insurance coverages required or made optional by this Agreement. In any such case, Carrier shall deduct or otherwise recover pursuant to Section 6 of this Agreement the cost of such coverage (which includes a mark-up earned by Carrier's affiliated insurance company and amounts for administrative services), as indicated in the attached Certificate of Insurance and/or on the "Insurance coverages" row in the Deductions Table in Section 4 of Appendix A (Contractor Election Form) (and under any notice and revised Certificate of Insurance pursuant to Section 10(F) of this Agreement).

10(E)(2).  **Automatic Authorization If Required Coverages Are Not Maintained.**  If Contractor

fails to provide proper evidence of the purchase or maintenance of the insurance required above, Carrier is authorized but not required to obtain such insurance at Contractor's expense and deduct or otherwise recover pursuant to Section 6(A) of this Agreement amounts reflecting all of Carrier's expense in obtaining and administering such coverage, as indicated in the attached Certificate of Insurance and in Section 6 of this Agreement.

**10(E)(3). Carrier Is Not In Business of Selling Insurance.** Contractor recognizes that Carrier is not in the business of selling insurance, and any insurance coverage requested by Contractor from Carrier is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter if such coverage has been obtained pursuant to Subsections 10(E)(1) and (2) of this Agreement above.

**10(E)(4). Certificate of Insurance.** Carrier shall ensure that Contractor is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy for the operation of the Equipment under which Contractor has authorized Carrier to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to Contractor for each type of coverage, and the deductible amount for each type of coverage for which Contractor may be liable), and Carrier shall provide Contractor with a copy of each policy upon request.

**10(F). Changes In Cost Or Other Details Of Coverages.** If Carrier is facilitating any insurance coverages for Contractor pursuant to Section 10(E) of this Agreement and the cost to Contractor for, or other details of, a coverage changes from the information listed in the "CERTIFICATE OF INSURANCE" in Section 5 of Appendix A (Contractor Election Form) of this Agreement, Contractor shall be so notified by Omnitracs transmission, fax, or other written notice. In any event, Contractor shall not be subject to any such change until twenty (20) calendar days after such notice or such later time as is set forth in the notice. Contractor's failure, by the end of twenty (20) calendar days after such notice, to notify Carrier of any objection to the change shall constitute Contractor's express consent and authorization to Carrier to implement the change and modify accordingly the deductions from Contractor's settlement compensation, beginning immediately after the 20-day period. Such modified amounts shall replace and supersede those shown in the Deductions Table in Section 4 of Appendix A (Contractor Election Form). Carrier shall thereupon provide Contractor with a revised certificate of insurance, required by Section 10(E)(4) of this Agreement, reflecting the change (such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to Contractor for each type of coverage, and the deductible amount for each type of coverage for which Contractor may be liable) and, upon request by Contractor, a copy of the corresponding insurance policy. If Contractor fails to notify Carrier of any objec-

tion within the 20-day period -- or if Contractor notifies Carrier of Contractor's objection within the 20-day period and Contractor and Carrier are then unable to resolve the matter to their mutual satisfaction -- Contractor and Carrier shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although Contractor shall remain subject to the change until Contractor's termination's effective date and time).

**11. CONTRACTOR COOPERATION.** Upon the happening of an occurrence, accident, or incident involving equipment covered by and within this Agreement, Contractor, and any driver operating the Equipment, pursuant to DOT rules and regulations, shall report this occurrence, accident, or incident to Carrier or its designee immediately by the first available means. Such report shall be completed as to the time, place, parties involved, and circumstances of the occurrence. Contractor and Contractor's driver, at Carrier's expense, shall cooperate with Carrier and/or its representative in the investigation of the occurrence and in any subsequent legal action, including the giving of sworn testimony in a deposition, or testifying during an administrative proceeding or at a trial in a court of law. Carrier shall retain the exclusive right to determine the disposition of any such proceeding by way of settlement, satisfaction of judgment, or appeal through the appropriate administrative agency and/or court.

**12. CONTRACTOR'S NONPERFORMANCE.** If, for any reason, Contractor or Contractor's driver fails to complete the transportation of commodities in transit in a timely manner (including Contractor's dropping a load at a facility Carrier operates or utilizes rather than at the consignee's location), or abandons the shipment, or otherwise subjects Carrier to liabilities from shippers, consignees, or governmental agencies on account of the acts or omissions of Contractor or Contractor's driver en route, Contractor agrees that Carrier shall have the right, without sending notice of breach to Contractor as provided in Section 14(D) of this Agreement, to complete performance through another contractor or other person, and then refrain from paying Contractor some or all of the compensation that Contractor would otherwise have earned for the trip and hold Contractor liable for any additional expense (beyond Contractor's forgone compensation) entailed in completing performance and, subject to Contractor's indemnity limits under Section 7(B)(2) of this Agreement, for any damages that Carrier pays to shippers or consignees arising out of the failure to make timely delivery of the shipment by Contractor. Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6 of this Agreement all such additional expense and damages.

**13. NOTICES.** All notices and notifications required or permitted by this Agreement shall be in writing (unless permitted elsewhere in this Agreement to be oral) and deemed to have been fully given (unless otherwise specified in this Agreement) upon personal delivery; or when faxed to the other party at the fax number shown at the end of this Agreement; or when sent by Omnitracs transmission by Carrier to the Equipment or by Contractor to Carrier; or the next business day after being deposited with an overnight delivery company with the express charges prepaid and properly addressed to the other party at the address shown

at the end of this Agreement; or three business days after being deposited in the United States Mail with first class postage prepaid and properly addressed to the other party at the address shown at the end of this Agreement. Carrier and Contractor shall be under a continuing duty to provide a correct address and telephone number to the other party, and Carrier and Contractor (if the latter has a fax machine) to provide a correct fax number to the other. Notice of an address, telephone-number, or fax-number change shall be given in writing.

14. DURATION OF AGREEMENT AND TERMINATION.

14(A).  Term.  This Agreement shall begin on the Effective Date and end on the Termination Date in the "In Witness Whereof" paragraph just above the signature block below.

14(B).  Equipment Receipt.  Upon taking possession of the Equipment, Carrier shall furnish Contractor with a receipt, in the form attached hereto, identifying the Equipment and stating the date and time when possession is taken by Carrier. The receipts required by this Section may be transmitted to Contractor by hand, mail, overnight delivery, fax, or other means of communication. Carrier shall maintain those records regarding the Equipment required by 49 C.F.R. § 376.11(d).

14(C).  Termination.  Either party may terminate this Agreement immediately, in accordance with the procedures in Subsection (D) of this Section, for any of the reasons set forth in that Subsection. In addition, this Agreement may be terminated at any time for any reason upon twenty (20) days' prior written notice to that effect to the other party personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement, or, if both parties have signed Appendix D (Consent to Conduct Business by Electronic Methods), by the electronic means specified in that appendix. The effective date and time of termination shall be as set forth in the written notice given by either party, or on the receipt for the Equipment if one is issued by Contractor to Carrier, or at the date and time when, as a practical matter, possession of the Equipment by Carrier pursuant to 49 C.F.R. § 376.11(b)(2) ends, whichever of these three dates/times is earliest.

14(D).  Reasons for Unilateral Termination by a Party.  Notwithstanding anything to the contrary in this Agreement, in the event of (1) a party's engaging in, or attempting, conspiring, or threatening to engage in, any act or omission that would constitute a felony or intentional tort, pursuant to Section 4 of this Agreement; (2) the insolvency or filing of bankruptcy of either party; (3) Contractor's violation of, or failure to fully adhere to and perform, the requirements of (a) any customer of Carrier to the extent provided by Section 4(H) of this Agreement, (b) any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), (c) Carrier's operating authorities; or (d) Carrier Policies and Procedures, all pursuant to Section 4(C) of this Agreement;

(4) Contractor's causing, in whole or in part, an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, pursuant to Section 4(C) of this Agreement; or (5) any other material breach of this Agreement by either party, the other party may terminate this Agreement by giving immediate oral (but only if the other party is reachable in person or by telephone), followed by written, notice of termination to the breaching party. In addition, Section 9(F)(3) of this Agreement provides, among other things, that either party may unilaterally terminate this Agreement on one day's notice if and when an initial decision is issued by a court or administrative agency reclassifying Contractor from independent-contractor to employee status.

14(E).  Survival of Liabilities and Entitlements.  If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of Contractor or Carrier under this Agreement, such liability or entitlement shall continue, notwithstanding the termination of this Agreement, until such liability or entitlement is satisfied in full.

15. CONTRACTOR'S OBLIGATIONS UPON TERMINATION.  Upon termination of this Agreement:

15(A).  Completion of Performance.  Contractor shall, unless otherwise instructed by Carrier, complete performance of all transportation and other services required by Carrier and any bills of lading pertaining to any shipment or shipments that Contractor may be engaged in hauling at the time of termination. Contractor shall receive no compensation for any shipment with respect to which he/she has failed to complete all required transportation and other services. In the event Carrier instructs Contractor not to complete performance of transportation or other services that Contractor is willing and able to perform, Carrier shall pay Contractor compensation determined in accordance with Appendix B (Contractor Compensation) for the portion of such services that Contractor performed prior to termination.

15(B).  Return of Carrier's Property.  Contractor shall, immediately upon termination of this Agreement or the completion of the transportation or other services provided for herein, whichever occurs later, both remove all of Carrier's identification devices from the Equipment and, except in the case of identification painted directly on the Equipment, return them to Carrier via prepaid hand-delivery, overnight delivery, or certified mail (provided that if the identification device has been lost or stolen, a written notice (letter) certifying its removal shall satisfy this requirement); return all of Carrier's property, including trailers, base plates, permits, and other paperwork, Omnitracs communications equipment, and freight, to Carrier's facility in Cedar Rapids, IA, or to any closer location Carrier designates; and pay Carrier all amounts Contractor owes Carrier at that time under this Agreement.

15(C).  Remedies for Failure to Return Carrier's Property.  If Contractor fails to return Carrier's property or freight to Carrier or remove and return all of Carrier's identification from the Equipment upon termination of this Agreement, Contractor shall pay Carrier all expenses (including reasonable attorneys' fees) Carrier incurs in seeking the return of such items, and Carrier may pursue other remedies

allowed by law or authorized in this Agreement against Contractor. Such remedies include withholding Contractor's last settlement payment until he/she removes and, except in the case of identification painted directly on the Equipment, returns all of Carrier's identification devices or delivers to Carrier a letter certifying that such devices have been removed, and making deductions from any remaining balances in Contractor's Escrow Fund for the replacement value of Carrier's unreturned property and for other amounts Contractor owes Carrier, as provided by Section 8 of this Agreement.

## 16.  FORM OF AGREEMENT AND MISCELLANEOUS PROVISIONS.

16(A).  General.  The subject headings of the sections and subsections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.  References in this Agreement to "he/she," "him/her," and "his/hers" shall be read as "it" and "its," respectively, if Contractor is a corporation, limited liability company, partnership, or other entity, rather than a natural person.

16(B).  Severability.  If any provision (including any sentence or part of a sentence) of this Agreement (including its appendixes and addendums) is deemed invalid for any reason whatsoever, this Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties.  Any provision voided by operation of the foregoing shall be replaced with provisions that shall be as close to the parties' original intent as permitted under applicable law.

16(C).  Waiver.  The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.  Original, faxed, otherwise imaged, or electronic signatures shall be equally valid.

16(D).  Complete Agreement.  Immediately upon this Agreement's becoming effective:

16(D)(1).  Complete Agreement.  This Agreement (including the attached Appendices and any addendums) constitute the entire Agreement between Carrier and Contractor – and fully replaces and supersedes any CRST Expedited, Inc. or CRST Van Expedited, Inc. Independent Contractor Operating Agreement or other prior or contemporaneous agreements, representations, and understandings – pertaining to the subject matter contained herein.

16(D)(2).  Credits and Debits Under Previous Agreement Between Parties.  Any Contractor escrow fund balances under any written agreement between the Parties that this Agreement replaces shall be credited to Contractor's Escrow Fund under this Agreement.  All compensation and other amounts due Contractor from Carrier, and all advances and other amounts due Carrier from Contractor, pursuant to any such predecessor agreement, shall remain due and

payable.  The amounts of compensation for trips started, and the amounts of advances and other amounts due Carrier, before the effective date of this Agreement shall be determined under the predecessor agreement; the payment procedures shall be determined under this Agreement; and the payment timing shall be determined under the predecessor agreement or this Agreement, whichever requires payment earlier.

16(D)(3).  Amendments.  No supplement, modification, or amendment to this Agreement shall be binding unless in writing and signed (either manually or electronically) by both Carrier and Contractor, except as otherwise provided with respect to charge-backs and other deductions in Section 6 of this Agreement and insurance deductions in Section 6 of Appendix A.  No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be deemed effective or binding upon the Contractor unless executed in writing by the party making the waiver.

16(E).  Copies of This Agreement and Statement of Lease.  Carrier shall, as set forth in 49 C.F.R. § 376.12(f), keep the original of this Agreement, with a copy to be retained by Contractor.  Pursuant to 49 C.F.R. § 376.11(c)(2), a "Statement of Lease" shall be carried on the Equipment for those periods that the Equipment is operated by or for Carrier under this Agreement.

17.  GOVERNING LAW.  This Agreement shall be interpreted in accordance with, and governed by, the laws of the United States and, except as otherwise provided herein, of the State of Iowa, without regard to the choice-of-law rules of such State or any other jurisdiction. THE PARTIES FURTHER AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING CEDAR RAPIDS, IA.  THE PARTIES HEREBY CONSENT TO THE JURISDICTION AND VENUE OF THE STATE AND FEDERAL COURTS SERVING CEDAR RAPIDS, IA.

18.  BINDING EFFECT.  This Agreement shall be binding on and inure to the benefit of Carrier and Contractor and their respective successors, assigns, heirs, personal representatives, and administrators.  Contractor may not assign or subcontract all or any portion of Contractor's obligations under this Agreement to another person without Carrier's prior written consent.

19.  COLLECTION EXPENSES.  Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement a finance charge of one and a half percent (1.5%) per month (eighteen percent (18%) annually), or the maximum allowed by law if less, to Contractor on balances over thirty (30) days' past due.  Contractor further agrees that if he/she defaults in the payment of any amount due and, to assist in collecting the amount due, Carrier engages the services of a collection agency, Contractor shall pay Carrier for all costs involved in such collec-

tion, including attorneys' fees, except to the extent otherwise determined by law.

**20. AUTHORITY TO COMPLETE CREDIT CHECK.** Carrier shall have the authority to obtain a credit report on Contractor from any national credit-reporting agency at any time during this Agreement and for as long (not exceeding one hundred eighty (180) days) after its termination as Contractor owes money to Carrier. Carrier may report Contractor's performance under this Agreement to credit-reporting agencies, including Contractor's failure to make payments on time. If Contractor wishes to know the names of the agencies Carrier has contacted, Contractor should so notify Carrier, and Carrier shall promptly provide them to him/her. If Contractor thinks Carrier reported erroneous information to a credit-reporting agency, Contractor should so notify Carrier. Carrier shall then promptly investigate the matter and, if Carrier's investigation shows Contractor was correct, Carrier shall contact each credit-reporting agency to which it reported the information and shall request that the agency correct the report. If Carrier disagrees with Contractor after Carrier's investigation, Carrier shall notify Contractor in writing and instruct Contractor how to submit a statement of Contractor's position to those agencies. Contractor's statement shall become a part of Contractor's credit record with the agencies.

IN WITNESS WHEREOF, Carrier and Contractor hereby execute this Agreement. This Agreement shall begin at 12:01 a.m. Central Time on the _____ day of _____, 20__ ("Effective Date") and end at 11:59 p.m. Central Time on October 1, 2018 ("Termination Date").

By signing below, Contractor acknowledges that, as reflected in the terms of this Agreement:

- Contractor is NOT an employee of Carrier, and all aspects of the relationship between Contractor and Carrier are based on Contractor's status as an independent contractor;

- Contractor has agreed to be responsible for the operating expenses incurred in connection with his/her business operations;

- Contractor's agreement to take responsibility for his/her expenses is an indispensable term of this Agreement but for which Carrier would not have agreed to pay the gross compensation stated above or entered into this Agreement;

- The gross compensation Carrier agrees to pay is not intended to ensure that Contractor covers his/her operating expenses, but instead to provide the amount of revenue sufficient, in the relevant market for such services, to convince a contractor-business both to provide, maintain, fuel, legally-credential, and otherwise operate suitable and dependable Equipment and to provide and pay a qualified professional driver or drivers to drive that Equipment; and

- The gross compensation paid to Contractor is MORE than Carrier would pay an employee to perform professional driving services, which reflects the reality of the marketplace, in that Carrier cannot attract contractors willing to take the entrepreneurial risk of funding and running their own businesses by paying merely the personal-services wage that they could get as employees.

CONTRACTOR: _____    CARRIER: CRST Expedited, INC.

Check one:
- ☐ Corporation
- ☐ Limited Liability Company
- ☐ Partnership
- ☐ Sole Proprietorship

Organized in State of: _____
With Employer ID No.: _____
OR Social Security No. (last 4 digits) _____

By: _____    By: _____
Signature                          Signature

_____
Authorized Rep.'s Name (Typed or Printed)

_____         Phillip Reges
Title                            Director- Independent Contractors
                                 3930 16th Avenue
_____         Cedar Rapids, IA 52406
Address (Street, P.O. Box)       Tel. 319-731-3890
                                 Fax 319-731-6558
_____
City, State & Zip Code

_____
Mobile Telephone Number    Fax Number

_____
Email Address

01-03-18
Date

## EQUIPMENT RECEIPT

RECEIVED FROM: ___Anthony Cervantes___ ("Contractor") the following
Equipment:
Printed Name of Contractor

| Equipment Type (Specify Tractor or Trailer) | Year | Make | Model | Serial (VIN) # | Carrier Unit # |
|---|---|---|---|---|---|
| | 2015 | FRTL | 3AKJGLD51 | FSGS 2668 | 116030 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

covered by the Independent Contractor Operating Agreement between Contractor and Carrier dated ____ / ____ /20____.
Carrier hereby accepts receipt of the above-identified equipment at ___:___ ___.M. Central Time on the _____ day of
_____, 20___, at _____ in ___Morton___, ___IL___
                                    Location                            City                    State

Contractor:

By: _____
Signature

Authorized Representative's Name (Typed or Printed)

Title  01-04-18          Driver's Name if Different
Date                          116030
                                 Tractor No.

Carrier:    CRST Expedited, Inc.

By: _____
Signature

Phillip Reges
Director – Operations - IC
3930 16th Avenue
Cedar Rapids, IA 52406
Tel. 319-731-3890
Fax 319-731-9245

APPENDIX A

CONTRACTOR ELECTION FORM

1.   EQUIPMENT.  The commercial motor vehicle equipment ("Equipment") governed by this Agreement consists of:

| Equipment Type (Specify Tractor or Trailer) | Year | Make | Model | Serial (VIN) # | Carrier Unit # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

2.   **BASE PLATES AND PERMITS**

   **2(A).   Base Plates.**  If Contractor so elects (by initialing OPTION 1, "Carrier shall obtain base plate...," below), Carrier shall initially pay the amount owed to the issuing jurisdiction for the base plate(s) and deduct or otherwise recover pursuant to Section 6(A) of this Agreement that expense, plus an administrative fee to Carrier. If this Agreement is terminated prior to Contractor's complete reimbursement of Carrier's expense, Carrier is hereby authorized to deduct or otherwise recover pursuant to Section 6(A) of this Agreement any remaining amount.  If Contractor removes and returns the base plate(s) to Carrier upon the termination of this Agreement and if Carrier then receives a refund or credit for the base plate(s) or resells the plate(s) to another contractor, Carrier shall refund to Contractor a prorated share of the amount received by Carrier, less any transfer or replacement fees owed to the plating jurisdictions.

CONTRACTOR SHOULD INITIAL <u>ONE</u> OF THESE TWO OPTIONS:

*[initialed]*   OPTION 1:      Carrier shall obtain Indiana (if Contractor has title to the vehicle) or Iowa International Registration Plan base plate for Contractor's tractor and charge the cost back to Contractor. The annual cost shall consist of the amount Carrier paid the issuing State for the plate (estimated initially and then adjusted up or down to match the actual amount billed to Carrier by the State), plus a ten percent (10%) administrative fee to Carrier.

_____   OPTION 2:      Contractor shall own base plate for tractor.

   **2(B).   Permits.**  Certain governmental permits and licenses, which are the financial responsibility of Contractor under Sections 5(F) and (G) of this Agreement, must be maintained to authorize Contractor to provide services to Carrier legally.

   **2(B)(1).   Unified Carrier Registration Fee.**  In 2005, Congress enacted the Unified Carrier Registration ("UCR") fee as a replacement for numerous states' Single-State Registration System ("SSRS") fees, effective with the 2007 calendar year.  The UCR fee is assessed against a motor carrier based on the number of trucks in the carrier's fleet.  Carrier shall deduct once a year, or otherwise recover pursuant to Section 6(A) of this Agreement, a pro rata share of this fee whatever fee is set under the law for the year divided by the number of trucks in Carrier's fleet, with no administrative fee paid to Carrier).

   **2(B)(2).   IFTA Permit and Fuel Tax Reporting.**  Under the International Fuel Tax Agreement ("IFTA"), an annual fuel tax permit must be obtained, and quarterly fuel taxes must be reported and paid to the IFTA base state, for the Equipment's operations nationwide.  Contractor may, by initialing the line to the left of OPTION 1 below, elect to obtain the IFTA permit and perform (or have a third-party vendor perform) all fuel tax reporting with respect to the Equipment, in accordance with Section 5(F)(2)(a) of this Agreement.  Alternatively, Contractor may, by initialing the line to the left of OPTION 2 below, elect to have Carrier obtain the IFTA permit and perform all fuel tax reporting with respect to the Equipment, in accordance with Section 5(F)(2)(b) of this Agreement.

CONTRACTOR SHOULD INITIAL <u>ONE</u> OF THESE TWO OPTIONS:



____ OPTION 1: Contractor shall obtain the IFTA permit, and perform all fuel tax reporting services, with respect to the Equipment at Contractor's expense.

OPTION 2: Carrier shall obtain the IFTA permit, and perform all fuel tax reporting services, with respect to the Equipment, and shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement the permit fee (with no admin. fee to Carrier), and any additional fuel tax that Contractor may owe.

2(B)(3). <u>Other Required Permits</u>. To make Contractor eligible to handle shipments in States served or transited by Carrier, Carrier shall obtain all permits required by law with respect to the Equipment and deduct or otherwise recover pursuant to Section 6(A) of this Agreement the cost (with no Carrier administrative fee).

2(B)(4). <u>Return of Permits</u>. All permits and licenses issued in Carrier's name shall be returned to Carrier upon termination of this Agreement. No refund shall be made to Contractor by Carrier of the permit costs upon termination of this Agreement, even if returned permits are reused by Carrier. Contractor shall be liable to Carrier for all expenses incurred by Carrier due to Contractor's failure to return all such permits.

2(C). <u>Settlement Deductions</u>. Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement seventy-five dollars ($75.00) per week until the total cost of base plate(s), permits, and/or fuel tax reporting (not including any additional fuel tax that Contractor may owe) under this Appendix are fully paid. The deductions shall begin immediately for current Contractors and the third full week after a Contractor first enters into this Agreement for new Contractors.

2(D). <u>Itemization Available</u>. Contractor may, upon request, obtain an itemization of the base plate and/or permit fees Carrier has advanced for Contractor pursuant to this Appendix, the portion of the total already paid by Contractor and the portion remaining.

3. <u>COMMUNICATIONS SYSTEM/EOBR. In accordance with Section 4(C)(3) of this Agreement *(CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS)*:</u>

*CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS:*

____ OPTION 1: Contractor shall furnish and install Contractor's own compatible Communications System/EOBR the Equipment.

OPTION 2: Carrier shall arrange, at its expense, to have a Communications System/EOBR installed in the Equipment and shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement the weekly rent set forth in Section 4 of this Appendix. *IF CONTRACTOR INITIALS THIS OPTION, CONTRACTOR SHALL ALSO SIGN THE ATTACHED OMNITRACS, LLC, SYSTEM RECEIPT.*

Under either OPTION 1 or OPTION 2, Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement a network usage charge of the amount per week shown in Section 4 of this Appendix (such amount being based on the average per-truck messaging usage charges to Carrier by Omnitracs, LLC, with no mark-up or administrative charge to Carrier).

4. <u>DEDUCTIONS TABLE</u>. Pursuant to Section 6(A) of this Agreement, Contractor hereby authorizes Carrier to charge back or deduct – from Contractor's gross compensation under Section 2 of this Agreement, from Contractor's Escrow Fund, or from other amounts Carrier owes to Contractor at the time of settlement with Contractor – amounts that, under this Agreement or any addendum, Contractor owes to Carrier, as set forth in the Deductions Table immediately below:

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| AQ | Accounting services if Contractor elects to obtain them from American Truck Business Services by signing the American Truck Business Services Addendum. | *See* the American Truck Business Services Addendum. |
| AD, WC | Advance Card – Advances in compensation not yet earned loaded by Carrier, at Contractor request, on Carrier's advance card ("CRST Advance Card"). | 1. Amount Carrier loaded on Contractor's CRST Advance Card at Contractor's request, plus a $4 per-Card-load fee (comprising both the amount charged by the CRST Advance Card issuer and an admin. fee to Carrier).<br><br>2. For each Carrier cash-load onto the Advance Card, the |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | . . . | third-party issuer of the Card will debit the Card a transaction fee for each direct-deposit or registration of a preauthorized check drawn from the Card after the first two debits. Also, each time Contractor uses the Advance Card to obtain cash from an automated teller machine, to make a purchase (at any truck stop or other vendor honoring such cards), or to make certain other transactions, the third-party issuer of the Card will deduct a per-transaction fee. None of the revenue from the Card-issuer's fees shall be shared with Carrier. All Advance Card transactions are governed by Card-issuer rules, which, together with Card-issuer transaction fee information, shall be available to Contractor by contacting the Card issuer's Internet web address listed on the Card or the Card issuer's Customer Service telephone line, 1-800-226-3870.<br><br>3. For use of the *credit*-card feature of the CRST Advance Card for fuel purchases, *see* "Fuel Purchases" row below. |
| SA, AD | Advance check | If Contractor elects, with Carrier's prior written consent, to use a Carrier advance check to pay any of Contractor's expenses under this Agreement, Carrier shall charge back the amount advanced, plus a $4 per-transaction fee (comprising both the fee charged by issuer of Carrier's advance checks and an admin. fee owed to Carrier). |
| ___ | Alternative Uses of Equipment Fee to help defray Carrier's administrative, regulatory, state tax, and possible insurance costs in connection with each Alternative-Use-of-Equipment trip. | For Exempt Motor Carriage, a $250-per-trip Alternative Use Fee. For all other Alternative Uses of Equipment, a $150-per-trip Alternative-Use-Fee |
| ___ | Cash-on-Delivery freight revenue from shippers, sublease carriers, or others that was not collected, or was collected but not remitted, by Contractor to Carrier when such actions were required by this Agreement. | Amount of freight revenue not collected, or collected but not remitted, to Carrier in violation of this Agreement. |
| KZ | Co-Driver Schooling Charges if Contractor elects, by executing the Co-Driver Schooling Deductions Addendum, to have Carrier provide driver training, and qualify, a relative or friend as a co-driver with Contractor. | *See* the Co-Driver Schooling Addendum. |
| LM, TO, ER, MR | Collection costs | Amount Carrier pays a collection agency to collect past-due amounts under § 19 of Agreement. |
| ___ | Communications equipment - Charges for loss of or damage to the Communications System/EOBR under § 4(C)(3) of this Agreement, if Contractor elects, by so indicating in Appendix A (Contractor Election Form), § 3, to have Carrier install such equipment in Contractor's tractor Equipment at Contractor's expense. | Amount paid to third-party vendor or otherwise incurred by Carrier. |
| ___ | Communications System/EOBR rental charges, if Contractor elected to have Carrier install a Communications System/EOBR in the Equipment pursuant to § 4(C)(3) of Agreement and § 3 of Appendix A (Contractor Election Form). | $7.63 per week |
| S6 | Communications Systems/EOBR network charge for unlimited messaging using communications equipment pursuant to § 4(C)(3) of Agreement. | $9 per week |
| AC, CC | Damages, losses, fines, penalties, court costs, | To extent the Damages are subject to the indemnity limits |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | attorneys' fees, and other expenses (together "Damages") Carrier incurs in connection with Contractor's obligations under this Agreement or breach thereof arising out of Contractor's negligence, gross negligence, willful misconduct, or other culpable acts or omissions under this Agreement, pursuant to § 7 of Agreement, subject to indemnity limits set forth in §§7(B)(1)-(2) of Agreement. | set forth in §§ 7(B)(1)-(2) of Agreement, Carrier shall deduct or otherwise recover pursuant to § 6(A) of Agreement up to $100 per week, until fully paid, for the up-to-$1,000 in Damages owed by Contractor for each accident claim (AC, A1, A2, A3, A4); and up $100 per week, until fully paid, for the up-to-$1,500 in Damages owed by Contractor for each non-accident claim (CC, C2, C3, C4).  If the Damages are governed instead by § 7(B)(3) of Agreement, the full amount of the Damages may be deducted immediately or on whatever schedule Carrier sets. |
| AR | Deficit payment:  Amounts deducted to retire debt to Carrier from previous settlement(s), plus interest | Amount Contractor owes Carrier, plus interest at a rate of 1.5% per month (18% per annum), unless applicable state law requires a lower rate. |
| EF | Detention, accessorial, and other customer-charge revenue not collected by Carrier from its customer because of Contractor's failure to transmit to Carrier the necessary documentation supplied by the shipper or consignee | Amount Carrier was unable to collect from customer as a result of Contractor's failure to transmit to Carrier the necessary documentation supplied by the customer, provided that no charge-back shall be made to Contractor if he/she contacted Carrier's dispatch regarding issue prior to departure from customer (consignor or consignee) location. |
| | Driver Recruiting charges pursuant to Driver Recruiting Addendum if Contractor elects to employ or contract to obtain the driving services of a Carrier employee-driver | See Driver Recruiting Addendum. |
| EY, JF | Earnings Correction - Credit to, or deduction from, Contractor's settlement compensation to reflect difference between the amount originally billed to the shipper and the amount ultimately collected from the shipper after correction of any errors on the bill | Amount credited or deducted shall be determined by applying Contractor's compensation rate(s) from Appendix B (Contractor Compensation) to the difference between the amount originally billed to the shipper and the amount ultimately collected from the shipper after correction of any errors on the bill |
| NZ, | Equipment lease payments if Contractor elects, by executing the Equipment Lease Charges Addendum and the Equipment Lease appended to it, to lease the Equipment from CRST Lincoln Sales, Inc. or One-Call Transportation, Inc. | See Equipment Lease and Equipment Lease Charges Addendum. |
| —— | Escort fee pursuant to § 4(D)(4) of this Agreement if Contractor's driver lacks a TWIC and therefore needs a suitably-credentialed escort in order to make a pickup or delivery at a port | Amount Carrier paid to escort. |
| FE | Express mail or other package delivery services if Contractor charges them to Carrier's account with the delivery service vendor. | Amount Carrier paid to U.S. Postal Service or other package delivery service vendor. |
| FD | Fines, penalties, including traffic tickets and related court costs, attorneys' fees, and other legal expenses that § 5(F)(3) of Agreement makes Contractor responsible for | Amount Carrier paid or otherwise incurred. |
| TX | Fuel and mileage taxes | In connection with quarterly computation and submission of fuel and mileage tax reports and payments to the various taxing jurisdictions, any net fuel or mileage tax owed at that time with respect to Contractor's operations in all taxing jurisdictions combined shall be deducted at $100 per week until fully paid,.  Carrier shall credit Contractor at next settlement with any net fuel or mileage tax credits or refunds due Contractor with respect to Contractor's operations in all taxing jurisdictions combined.  See also of Appendix A (Contractor Election Form), § 2(B) regarding possible charge-backs for IFTA Fuel Tax Permit. |
| FU | Fuel purchases | 1. When Contractor elects to purchase fuel from third-party vendors using the credit-card feature of the CRST |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | | Advance Card, Carrier shall deduct – and show on Contractor's settlement statement – or otherwise recover pursuant to § 6(A) of Agreement an amount no greater than the price posted at the fuel vendor's pump (plus the Card-issuer's transaction fee in certain instances – *see* Item 3 below). The amount deducted or otherwise recovered, if less than the cash (pump) price, is the result of a cents-off-retail discount to Contractor that Carrier has negotiated with the fuel vendor. Discount amounts available to Contractor are as indicated in Supplement 1 ("CRST Fuel Purchasing Program") to this Appendix. Carrier shall deduct or otherwise recover pursuant to § 6(A) of Agreement the cents-off-retail discount price (that is, the price posted at the fuel vendor's pump, less the cents-per-gallon discount negotiated by Carrier, at time of Contractor's purchase). In the event of any changes in Supplement 1, Carrier shall provide Contractor with an updated version before the changes take effect. 2. If Carrier receives any discount on Contractor's fuel purchases or if the fuel purchases of all Carrier's contractors combined reach certain volumes resulting in Carrier's receiving rebates from some fuel vendors, Carrier shall retain all such discounts and rebates and NOT share them with Contractor or other contractors. 3. If Contractor elects to purchase fuel, using the CRST Advance Card, at a truck stop that is not listed in Supplement 1 to this Appendix and thus does *not* offer Carrier's contractors a cents-off-retail discount, Contractor will be charged back whatever transaction fee the Advance Card issuer charges to Carrier. 4. Contractor is under no obligation to use the CRST Advance Card for fuel or other purchases, and may instead use cash, checks, or other credit or charge cards. |
| ZA, ZB, ZC, ZD, ZE, ZF (etc.), GA | Garnishment orders (including but not limited to child-support orders) by courts and tax liens against Contractor or Carrier compensation | $100 per week or the amount Carrier paid in compliance with any lawfully issued order or lien, a copy of which Carrier shall supply to Contractor at or before the first deduction relating to it, plus an admin. fee to Carrier (the amount to be determined by the law of the jurisdiction issuing the order or lien, or, if such state does not address admin. fees, the law of the State of Iowa). After termination of, but not during, this Agreement, Carrier shall deduct from Contractor's Escrow Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in Contractor's Settlement Compensation. |
| BD | General Escrow Fund (former Performance Bond) contributions by Contractor | *See* Appendix A (Contractor Election Form), § 8(A) |
| MZ | Inspection of Equipment to the extent the financial responsibility is Contractor's under Agreement, § 4(A) | Amount Carrier paid outside vendor. If Contractor elects to obtain inspections from Carrier's maintenance facility, the amount Carrier incurred for parts and labor resulting in a price competitive with other maintenance vendors in the relevant market |
| BT, 7S, DP, PJ, | Insurance coverages Contractor elects, via the CERTIFICATE OF INSURANCE in § 6(A) of Ap- | *See* Appendix A (Contractor Election Form), § 5 The costs stated in Appendix A (Contractor Election |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| PP, IB, GP | pendix A (Contractor Election Form) and/or by executing a CRST International "Passenger Accident Program Enrollment Form," to have Carrier facilitate or that Carrier maintains at its expense because Contractor failed to provide proper evidence of the purchase or maintenance of the required coverages under § 10(E) of Agreement | Form), § 5, are amounts the insurer(s) charged for the required and optional coverages Contractor selected (and for those required coverages with respect to which Contractor failed to provide Carrier proper evidence of Contractor's purchase and maintenance of them), including, where indicated, profit to Carrier's affiliated insurance company and/or an admin. fee to Carrier.  The costs are subject to possible increases (see § 10(F) of Agreement). |
| LI, LE | Licensing (base plate fees), if Contractor elected, by so indicating in § 2 of Appendix A (Contractor Election Form) or an Addendum, to have Carrier pay the fees in advance | See Appendix A (Contractor Election Form), § 2(A), or an Addendum, regarding partial refunds of base plate fees Carrier shall provide Contractor under certain circumstances. |
| LI, LE | Licensing (permit fees) under § 7(B) Agreement and § 2 of Appendix A (Contractor Election Form) or an Addendum, but not including overdimensional permit fees | See Appendix A (Contractor Election Form), § 2(B) or an addendum. |
| IL | Loan payments if Contractor elects, by so indicating on Loan Addendum, to borrow an amount of $1,000 or more from Carrier to cover cost of maintenance,  repairs, or other expenses | Weekly payments of at least $250/week based on principal and interest agreed to by Contractor and Carrier, as reflected in Loan Addendum. |
| DU | Logo Store clothing and other items that Contractor elects to purchase at Carrier's store | Amount Carrier incurred, plus markups resulting in prices (which shall be provided to Contractor upon request at the time he/she purchases or places order for items) competitive with other vendors in the relevant market(s). |
| R8 | Maintenance and Other Reserve Fund contributions by Contractor | See Appendix A (Contractor Election Form), § 8(B). |
| RJ, RH, P9, M2, ML, RG, RG, RI, RJ, RK, RL | Maintenance, repairs, parts, and replacement tires that Contractor elects, and Carrier each time agrees, to have Carrier advance funds for the purchase from third-party maintenance providers and charge Contractor back for it | Amount Carrier paid maintenance provider.  If Contractor elects to obtain products or services from Carrier's third-party maintenance provider, the amount Carrier incurred for parts and labor, plus an administrative fee of $5 per hour, resulting in a price competitive with other maintenance vendors in the relevant market. If Contractor elects to pay the outside vendor directly using a Carrier Advance Check or Card, see "Advance Check" or "Advance Card" rows above. |
| MC | Motel/hotel guestroom and other charges if Contractor elects to have Carrier advance such charges | Amount Carrier paid outside vendor or, if Contractor elects to stay in Carrier's hotel, the amount Carrier incurred, plus a markup resulting in a price (which shall be provided to Contractor upon request at the time he/she checks into the hotel) competitive with other hotel/motel vendors in the relevant market |
| MC | Operating expenses not otherwise listed in this table for which Contractor is responsible under this Agreement and regarding which Carrier receives a purchase order or invoice is otherwise requested by Contractor to make an expenditure in the first instance. | Amount Carrier paid or otherwise incurred.  For use of Advance Card to pay for maintenance, repairs, or tires, see "Advances Card" row above. |
| MC | Parking charges Carrier paid outside vendor for parking | Amount Carrier paid outside vendor. |
| RQ | Personal Insurance Program, including medical, dental, vision, critical illness, disability, and permanent life coverages. | See the Personal Insurance Program Addendum. |
| PY | Physical examinations for Contractor's drivers | Amount Carrier paid outside vendor.  See also "Co-Driver Schooling Addendum, if applicable. |
| IL | Previous deficit payment plan:  Payments by Contractor to retire debt owed to Carrier from operations under a previous independent contractor operating agreement pursuant to a Loan Addendum. | See Loan Addendum. |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|------|-------------------------------------|----------------------------------------------|
| FI | Routing and/or Fuel Optimization Services if Contractor elects, by initialing OPTIONS 2 or 3 in Appendix A (Contractor Election Form), § 7, to purchase such services from or through Carrier | *See* Appendix A (Contractor Election Form), § 7 |
| FC | Sublease payments to Carrier if Contractor elects to use the Equipment to handle trip-leased loads pursuant to § 1(E)(2)(b) of Agreement | *See* § 1(E)(2)(b) of Agreement. |
| MC | Travel cost (bus, air, taxi, or other passenger fares) if Contractor needs to travel due to an accident or for other Carrier-approved trips. | Amount Carrier paid outside vendor. |
| MC | Termination-related expenses pursuant to § 14 of Agreement, including without limitation reasonable attorneys' fees, involved in seeking the return of, replacing, or having to forego refunds, credits, or sale proceeds relating to Carrier's base plates, permits, identification, and other property, including trailers, paperwork, satellite communications equipment, and freight | Amount Carrier paid or otherwise incurred. |
| RJ, RH, P9, M2, ML, RG, RG, RI, RJ, RK, RL | Tire purchases if Contractor elects to purchase tires at discount from retail prices through Carrier's National Account Programs | Amount Carrier paid to outside vendor plus a $10 per tire admin. fee to Carrier |
| T0 | Tolls for highways, bridges, tunnels, ferries, and other facilities | Amount Carrier paid to the toll authorities, plus any related fines, penalties, and fees |
| —— | Trip-completion additional expense and/or damages, pursuant to § 12 of Agreement | Amount Carrier paid or otherwise incurred beyond the amount of Contractor's forgone compensation pursuant to § 12 of Agreement |
| T8 | TRANSFLO Express® charges if Contractor elects to use Carrier's account with TRANSFLO Express® to send correspondence to Carrier's offices or those of its affiliates on an expedited basis | $15 per month for unlimited dispatches, comprising both the amount Carrier paid to TRANSFLO Express® and an admin. fee to Carrier. |
| MZ | Truck washes if Contractor uses Carrier's account | Amount Carrier paid outside vendor. |
| TU | Usage charge for Carrier's Trailer(s), pursuant to § 5(H) of Agreement | $25 per week |

    5.  **CERTIFICATE OF INSURANCE.**  Contractor hereby requests Carrier, through Carrier's insurer, to facilitate on Contractor's behalf (if they are available) the insurance coverages Contractor has selected by placing Contractor's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **1.** <u>Non-Trucking (Bobtail) Liability Insurance:</u> | |
| Name of Insurer:     Great Plains Casualty, Inc. | _(initialed)_ YES |
| Policy No:     GPNTIA030 and GPENTIA031 | _____ NO |
| Effective Date(s):     From the effective date (below) of this Certificate of Insurance through the next succeeding June 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions | |
| Amount of Coverage:     $500,000 combined single limit | |
| Cost to Contractor:     $30 per Unit of Equipment per month<br>_Includes profit to Carrier's affiliated insurance company_ | |
| Deductible:     $0 per occurrence | |
| If Contractor domiciled in Michigan: | |
| Name of Insurer:     Hudson Insurance Co. | |
| Policy No:     TIS40101-127674 | |
| Effective Date(s):     From the effective date (below) of this Certificate of Insurance through the next succeeding October 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions | |
| Amount of Coverage:     $500,000 combined single limit | |
| Cost to Contractor:     **$44.17 per Unit of Equipment per month**<br>_Includes profit to Carrier's affiliated insurance company_ | |
| Deductible:     $0 per occurrence | |
| **2.** <u>Workers' Compensation Insurance</u> *(CONTRACTOR SHOULD INITIAL "YES" IN THE COLUMN TO THE RIGHT OF <u>ONLY ONE</u> OF THE FOLLOWING TWO OPTIONS -- A OR B):* | |
| **A.**     By initialing "YES" in the column to the right, CONTRACTOR ELECTS TO PURCHASE WORKERS' COMPENSATION COVERAGE FOR HIMSELF/HERSELF AND CONTRACTOR'S DRIVERS OR OTHER EMPLOYEES (IF ANY) FROM AN INDEPENDENT SOURCE <u>NOT</u> FACILITATED BY CARRIER. CONTRACTOR HAS PROVIDED CARRIER WITH A COPY OF THE INSURANCE POLICY DECLARATIONS PAGE EVIDENCING SUCH COVERAGE IN ACCORDANCE WITH SECTION 10(B)(2)(d) OF THIS AGREEMENT. | _____ YES |
| **B.**     By initialing "YES" in the column to the right, Contractor attests that HE/SHE HAS NO EMPLOYEES AND that he/she is <u>NOT</u> a resident of, and the work is <u>NOT</u> principally localized in, KANSAS or any state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator, and CONTRACTOR HAS ELECTED <u>NOT</u> TO OBTAIN WORKERS' COMPENSATION COVERAGE FOR HIMSELF/HERSELF INDEPENDENTLY. | _____ YES |

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **3.** **Occupational Accident Insurance** | |
| WHERE STATE LAW ALLOWS AND CARRIER APPROVES | _____ YES |
| Name of Insurer:     Zurich American Insurance Co. | _____ NO |
| Policy No:     216-000-654 | |
| Effective Date(s):     From the effective date (below) of this Certificate of Insurance through the next succeeding November 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions | |
| Amount of Coverage:     Up to $1,000,000 per occurrence based on schedule of benefits available to Contractor upon request (benefits are reduced for individuals over 70 years old) | |
| Cost to Contractor:     $154.00 per covered individual per month (including an administrative fee to Carrier), deducted at $35.54 per week for 52 weeks – or, if over 70 years old, $145.00 per covered individual per month (with no administrative fee to Carrier), deducted at $36.25 per week for first 48 weeks of coverage year *All costs include profit to Carrier's affiliated insurance company* | |
| Deductible:     $0 | |
| **4.** **Physical Damage Insurance:** | |
| Name of Insurer:     Great Plains Casualty, Inc. | _____ YES |
| Policy No:     GPPYIA040 | _____ NO |
| Effective Date(s):     From the effective date (below) of this Certificate of Insurance through the next succeeding September 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions | |
| Amount of Coverage:     Contractor-specified value of Unit of power-unit Equipment of $_____ (any Tractor Equipment claims, however, shall be paid at only the actual cash value of insured Tractor Equipment at time of occurrence, in accordance with insurance policy) | |
| Cost to Contractor:     4.5% of Contractor-specified value of Tractor Equipment, deducted weekly for 52 weeks *Includes profit to Carrier's affiliated insurance company and administrative fee to Carrier* | |
| Deductible:     $1,000 per occurrence | |

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 5. **Insurance for Cargo, Carrier's Trailer(s), and Related Expenses** | ___ YES ___ NO |
| Name of Insurer: Great Plains Casualty, Inc. | |
| Policy No: GPPYIA022 | |
| Effective Date(s): From the Effective Date as stated in Section 2(a) of this Agreement through the next succeeding September 1st, and each subsequent renewal period. | |
| Amount of Coverage: $75,000 combined single limit per occurrence for damage to cargo, Carrier's Trailer(s), and related towing and clean-up costs. For more details regarding coverage, see insurance policy. | |
| Cost to Contractor: $34.62 per week *Includes profit to Carrier's affiliated insurance company* | |
| Deductible: $1,000 per occurrence | |

6. **CERTIFICATE OF WORKERS' COMPENSATION INSURANCE** (If Contractor Elects **NOT** To Have Coverage Facilitated By Carrier)

If Contractor has elected NOT to have Carrier facilitate workers' compensation (or, where permitted, occupational accident) insurance coverage, Contractor hereby certifies that the statement below, to the left of which Contractor's undersigned authorized representative has inscribed Contractor's initials, is true and correct (Contractor SHOULD INITIAL ONLY ONE BOX):

| CONTRACTOR: Please Initial ONE Box Below If Statement Is TRUE | STATEMENT |
|---|---|
| _____ | 1. Contractor has NO employees; and he/she IS domiciled in a state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. Accordingly, as REQUIRED by Section 10(B)(2) of this Agreement, Contractor HAS purchased workers' compensation insurance coverage for himself/herself. Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy, showing principal coverage in Iowa and in the state in which the work will be principally localized (as required by Sections 10(B)(2) and 10(C) of this Agreement is attached hereto; OR |
| _____ | 2. Contractor has NO employees; and he/she IS domiciled in Kansas, Mississippi, or Utah. Accordingly, as REQUIRED by Section 10(B)(2) of this Agreement, Contractor HAS purchased workers' compensation insurance coverage or occupational accident insurance coverage for himself/herself. The certificate of insurance and declarations page from Contractor's insurance policy (as required by Section 10(C) of this Agreement) is attached hereto; OR |
| _____ | 3. Contractor has NO employees; and he/she IS NOT domiciled in Kansas, Mississippi, Utah, or any state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. Contractor has elected NOT to purchase workers' compensation insurance coverage for himself/herself. NOTE: In some states (consult Carrier as to which ones), workers' compensation coverage under this Agreement shall be mandatory if Contractor is a corporation or limited liability company; OR |
| _____ | 4. Contractor has NO employees; and he/she IS NOT domiciled in a state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. Contractor has nonetheless elected to purchase workers' compensation insur- |

| CONTRACTOR: Please Initial ONE Box Below If Statement Is TRUE | STATEMENT |
|---|---|
| | ance coverage for himself/herself. Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy; OR |
| | 5. Contractor has [insert number]____ employees and, as REQUIRED by Section 10(B)(2) of this Agreement, HAS purchased workers' compensation insurance coverage (or occupational accident insurance coverage where both state law allows and Carrier approves) for himself/herself (if Contractor is a natural person) and those of Contractor's drivers, employees, agents, and other persons required to be covered under the workers' compensation law of any state that is reasonably likely to have jurisdiction over Contractor's business operations. Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy, showing principal coverage in Iowa and in the state in which the work will be principally localized (as required by Sections 10(B)(2) and 10(C) of this Agreement. |

7. **ROUTING AND FUEL OPTIMIZATION SERVICES.** To improve Contractor's efficiency and profitability, Contractor may choose to rely on either free or purchased routing and fuel optimization information, software, or other services. If Contractor elects to purchase such services from or through Carrier, he/she should initial OPTIONS 2 below. Otherwise, Contractor should initial OPTION 1.

*CONTRACTOR SHOULD INITIAL ONLY ONE OF THESE OPTIONS:*



    OPTION 1:    Contractor shall obtain routing and/or fuel optimization information, software, or other services, including such free online services as those found at www.mapquest.com, maps.yahoo.com, and maps.google.com, on Contractor's own or forgo such services altogether.

_____  OPTION 2:    Carrier shall facilitate Contractor's purchase of routing and/or fuel optimization services from third-party vendor PC*Miler, using the most recent version of the PC*Miler|Web internet-based routing platform, by paying the $19.95 /month price to the vendor (with no admin. fee to Carrier) and deducting or otherwise recovering this expense from Contractor pursuant to Section 6(A) of this Agreement in the amount of $4.99/week

_____  OPTION 3:    Carrier shall sell its own routing and/or fuel optimization services to Contractor for $4.00/week price to the vendor and deducting or otherwise recovering this expense from Contractor pursuant to Section 6(A) of this Agreement.

8. **PRINCIPAL IN ESCROW FUNDS.**

    **8(A).** General Escrow Fund. The Principal Amount in the General Escrow Fund shall be two thousand dollars ($2,000), to be deducted, pursuant to Agreement § 8(A)(1), at seventy-five dollars ($75) per week.

    **8(B).** Maintenance and Other Reserve Fund.

      **8(B)(1).** Minimum Principal. The minimum Principal Amount in the Maintenance and Other Reserve Fund shall be two hundred fifty dollars ($250), to be deducted, pursuant to Agreement § 8(A)(2), at one cent ($0.01) per mile for all loaded miles operated under Carrier dispatch (as specifically directed or authorized by Carrier), based on Carrier's most current (at the time of Contractor's trip) version of Rand McNally MileMaker® computerized mileage guide, which Carrier shall make available for viewing and printing of particular Contractor-requested point-to-point mileage calculations at any Carrier terminal during normal business hours.

      **8(B)(2).** Additional Principal. In accordance with Section 8(A)(2)(b) of the Agreement –

*CONTRACTOR SHOULD INITIAL ONLY ONE OF THESE TWO OPTIONS:*



    OPTION 1:    Contractor chooses to continue building the Maintenance and Other Reserve Fund once the minimum Principal Amount has been fully deposited, and hereby authorizes Carrier to deduct from Contractor's settlement compensation and deposit in the Fund one hundredth of a cent ($0.01) per mile for all loaded miles operated under Carrier dispatch or Twenty-five Dollars ($25.00) per week up to a total Additional Principal of $__o03____. If no total amount is stated, the specified deductions shall not end until Contractor notifies Carrier in writing to stop them.

———  <u>OPTION 2:</u>     Contractor chooses NOT to build any Additional Principal in the Maintenance and Other Reserve Fund.

THIS APPENDIX A, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ __.m. Central Time on the ___3___ day of ___Jan_____, 20 1 8

Contractor: _Anthony Linnet_____

By: _____
    Signature

_____
Authorized Representative's Name (Typed or Printed)

_____
Title            Driver's Name if Different

_____
Date            Tractor No.

Carrier:    CRST Expedited, Inc.

By: _____
    Signature

Phillip Reges
Director – Operations - IC
3930 16th Avenue
Cedar Rapids, IA  52406
Tel. 319-731-3890
Fax 319-731-9245

### OMNITRACS, LLC, COMMUNICATION SYSTEM/EOBR RECEIPT

Contractor hereby acknowledges that the following items of an Omnitracs, LLC, communications unit have been received by him/her from, and installed in Contractor's Equipment (truck tractor) indicated below, by Carrier:

### Each Omnitracs, LLC, System Unit:

| | |
|---|---|
| 1 | Outdoor Unit (Antenna) |
| 1 | Communications Unit (Black Box) |
| 1 | Display Unit (Keyboard and Screen) |
| 1 | Pager System |

**Equipment (Tractor) #**                    **Omnitracs, LLC, Unit #**

_____                    _____

Contractor: _____

By: _____
    Signature

_____
Authorized Representative's Name (Typed or Printed)

Title _____    Driver's Name if Different
01- 03 -18
Date                                Tractor No.

SUPPLEMENT 1

CRST FUEL PURCHASING PROGRAM

CRST Expedited, Inc. ("CRST") is committed to giving you options for reducing your operating costs, by offering you discount-purchase programs. By operating with CRST, you can choose to take advantage of our volume buying power, though always remaining free to make different purchases using cash or personal credit cards. When you use your CRST Advance/Fuel card, you qualify for a fuel discount below <u>cash</u> (pump price in the amounts indicated at the nationwide fuel chains listed below. These discounts apply only when you use your CRST Advance/Fuel card.



www.loves.com
6 cents off cash price per gallon



www.pilotflyingj.com
6 cents off cash price per gallon



www.petrotruckstops.com
6 cents off cash price per gallon



www.pilotflyingj.com
6 cents off cash price per gallon



www.tatravelcenters.com
6 cents off cash price per gallon

## APPENDIX B

## CONTRACTOR COMPENSATION

1.  **CONTRACTOR'S GROSS COMPENSATION.** As the total gross compensation for the use of the Equipment and for everything furnished, provided, done by, or required of Contractor in connection with this Agreement, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services, Carrier shall pay Contractor Base Compensation plus Additional Compensation as follows:

1(A).  **Base Compensation**

1(A)(1).  **Applicable Percentages.** Carrier shall pay – A percentage of Adjusted Gross Revenue, as defined in Paragraph 2 of this Subsection, billed to the shipper for a shipment as follows -- seventy percent (70%) if the Carrier provides the trailer; seventy-five percent (75%) if Contractor provides the trailer; or seventy-eight percent (78%) if Contractor provides a refrigerated trailer.

1(A)(2).  **Definitions.** Throughout this Agreement –

1(A)(2)(a).  <u>Gross Revenue</u> shall mean all revenue – billed by Carrier to shippers, consignees, brokers, logistics companies, freight forwarders, other carriers, or other customers (referred to together as "Carrier's Customer" throughout this Agreement) in connection with shipments Contractor hauls under this Agreement – for pickup and delivery charges, mileage charges, linehaul transportation charges, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges.

1(A)(2)(b).  <u>Adjusted Gross Revenue</u> ("AGR") shall mean Gross Revenue for a particular shipment, reduced by any and all:

1(A)(2)(b)(1).  Incentive, discount, fee (including for loading or unloading services provided by Carrier's Customer either directly or through a Third Party), or commission Carrier gives Carrier's Customer with respect to the shipment;

1(A)(2)(b)(2).  All amounts Carrier paid to third parties, including but not limited to Carrier's Customer or an affiliate of Carrier, (together, "Third Parties") in relation to movement of the shipment if not covered by a charge separately stated on Carrier's invoice to Carrier's Customer, including, but not limited to, fees or commissions (including commission recoveries), paid to brokers, freight forwarders, interline or augmenting carriers, warehouse or other storage providers, terminals, agents, or any other Third Party, expenses attributable to an accessorial service, escorts, overweight, overdimensional, or other permits, loading and/or unloading (including lumper) services, freight payment-processing fees (consisting of the actual cost incurred by Carrier for the shipment if Carrier's customer or an outside payer makes deductions from Carrier's freight charges related to electronically-transmitted billing and payment account use), amounts paid or accrued for cartage, certain specialized trailers and excessive trailer spotting, tarping, or special security measures paid to a Third Party or to Contractor; and amounts paid to other contractors as a pro rata payment for their participation in the movement of a shipment; and

1(A)(2)(b)(3).  Charges separately stated on Carrier's invoice to Carrier's Customer as fuel surcharges (or fuel or other cost adjustments or special fuel charges), detention charges actually received from the shipper, loading and unloading (including lumper) charges, "truck ordered but not used" charges, insurance surcharges, escort service charges, tolls, overdimensional and other permits, trailer charges, cartage charges, spotting charges, freight payment processing fees, excess-value charges or high-value freight charges, surcharges for special security measures, charges for Third-Party contract services, charges for the international p ortion of loads going to or coming from Mexico, and charges for other services Carrier obtained from a broker, freight forwarder, interline or augmenting carrier, warehouse or other storage provider, terminal, agent, other independent contractor, or other third party.

1(B).  **Additional Compensation**

1(B)(1).  **Fuel-Related.** Ninety-seven percent (97%) of the fuel surcharges billed to the shipper for a shipment; and

1(B)(2).  **Accessorial Charges.**

1(B)(2)(a).    Overdimensional Permit Fees.    One hundred percent (100%) of any overdimensional permit fee (if paid by Contractor).

1(B)(2)(b).    Other Charges.    The same percentage as Section 1(A)(1) of this Appendix applies to Adjusted Gross Revenue of any detention charges, "truck ordered but not used" charges, loading and unloading (lumper) expense, tolls, and other accessorial charges that Carrier actually collects from the shipper for a shipment.

1(B)(3).    Hazardous Materials Charges.    For hazardous materials shipments booked after October 21, 2013, requiring the use of a driver that is certified by the DOT as qualified to operate a vehicle containing hazardous materials or where a Shipper requests the use of a hazardous materials qualified driver for a shipment after that date, Carrier shall pay Contractor four cents ($.04) per mile on those shipments in addition to the compensation Carrier pays pursuant to Section 1(A) of this Appendix B. In the event Contractor has as a co-driver on a shipment Contractor has accepted pursuant to this Section 1(B)(3) a driver not qualified to operate a vehicle containing hazardous materials, Carrier will pay Contractor four cents ($.04) per mile on a split-mile basis. In the event Contractor has as his co-driver on a shipment Contractor has accepted pursuant to this Section 1(B)(3) a driver who is also certified to operate a vehicle containing hazardous materials, then Carrier will pay four cents ($.04) for all miles on the shipment. By accepting the hazardous materials shipments, Contractor represents to Carrier that the driver operating the motor vehicle used to transport the hazardous materials shipment is qualified to operate a motor vehicle containing hazardous materials.

## 2.    CHANGES IN COMPENSATION.

2(A).    Temporary Change.    Carrier and Contractor may make a temporary change in Contractor's compensation to be paid for one or more services relating to a shipment or shipments under this Agreement by both parties' signing (either manually or, as indicated in Section 2(B) of this Appendix, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply. Contractor shall be under no obligation to accept the change in compensation by signing such an addendum, and Carrier shall not terminate this Agreement for Contractor's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in such event, Carrier are hereby authorized not to assign you loads covered by such change in the meantime. Such temporary change shall not be effective for more than twenty (20) calendar days.

2(B).    Ongoing Change.    If any aspect of Contractor's compensation set forth in this Appendix B will be changing on an ongoing basis, Contractor shall be provided a proposed addendum containing the change at least twenty (20) calendar days in advance by hand, fax, overnight delivery, or, if the parties have agreed to such forms of communication by both signing Appendix D (Consent to Conduct Business by Electronic Methods) of, or a similar addendum to, this Agreement, by the electronic means specified in that appendix. If Contractor wishes to continue operating on behalf of Carrier, he/she shall, by the effective date and time shown on the addendum, EITHER manually sign the addendum and deliver it to Carrier by hand, fax, or overnight delivery OR, if both parties have signed Appendix D of, or a similar addendum to, this Agreement, by signing the addendum by the electronic means specified in that appendix. If Contractor does not take one of these actions consenting to the change within the time indicated on the addendum,, the addendum shall operate as a notice of termination under Section 14 of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum, provided that, in such event, Contractor shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

## 3.    EARNINGS ADJUSTMENTS.

3(A).    Billing Error.    If Carrier discovers and corrects an error in, or in Carrier's sole judgment decides to retroactively increase or decrease, the amount of any item billed to Carrier's customer on a shipment that Contractor hauled and for which Contractor was compensated pursuant to a percentage of Adjusted Gross Revenue, Carrier shall credit to, or deduct from, Contractor's gross compensation at the next settlement a share – corresponding to the percentage of such revenue normally payable to Contractor for the shipment – of the additional amount Carrier actually collects or refunds in remedying the error. Carrier shall provide Contractor, before or at the time of settlement, with a copy of the amended rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill, and shall otherwise meet the requirements of Section 3(B) of this Agreement with respect to the shipment.

3(B).    Billed Amount Uncollectible.    If, after making a commercially reasonable effort to do so, Carrier is unable to collect from a customer the full amount of any item billed to the customer for a shipment that Contractor hauled and for which Contractor was compensated pursuant to a percentage of Adjusted Gross Revenue, Carrier shall deduct from Contractor's gross compensation at the next settlement a share of the unpaid amount that corresponds to the percentage of such revenue normally payable to Contractor for the shipment. Carrier shall give Contractor, before or at the time of settlement, a written explanation of Carrier's efforts to collect from its customer and the computation of the amount being deducted from Contractor's gross compensation, Escrow Fund, and any other amounts due Contractor from Carrier.

4. <u>METHOD OF DISBURSEMENT OF SETTLEMENT COMPENSATION.</u>  Carrier shall pay Contractor any net settlement compensation due through the OPTION specified by Contractor below (with no administrative fee to Carrier).

Contractor SHOULD INITIAL <u>ONLY ONE</u> OF THESE THREE OPTIONS (on the line to the left):

_____  **OPTION 1 (Cash Loads onto Contractor's Settlement Card):**  Carrier shall pay settlement compensation by loading cash onto Contractor's Settlement Card, which is purely a debit card (in other words, Contractor may use it for transactions only up to the total cash value on the card, not for credit transactions).  For each Carrier cash-load onto the Settlement Card, the third-party issuer of the Card will debit the Card a transaction fee for each direct-deposit or registration of a preauthorized check drawn from the Card after the first two debits.  In addition, each time Contractor uses the Settlement Card to obtain cash from an automated teller machine, to make a purchase (at any truck stop or other vendor honoring such cards), or to make certain other transactions, the third-party issuer of the Card will deduct a per-transaction fee.  None of the revenue from the Card-issuer's fees shall be shared with Carrier.  All Settlement Card transactions are governed by Card-issuer rules, which, together with Card-issuer transaction fee information, shall be available to Contractor by contacting the Card Issuer at its Internet web address listed on the Card or the Card Issuer's Customer Service telephone line, 1-800-226-3870.

_____  **OPTION 2 (Weekly Payments via Carrier Bank Check – Mailed):**  Carrier shall pay settlement compensation by sending a bank check by U.S. First Class Mail to the address required by Section 13 (Notices) of this Agreement or, if Contractor chooses the following different address, to:

_____
Address (Street, P.O. Box)

_____
City, State & Zip Code

_____  **OPTION 3 (Weekly Payments via Carrier Bank Check – Picked Up at Terminal):**  Carrier shall pay any Settlement Compensation by making a bank check available for pick-up by Contractor at the terminal of Carrier to which Contractor is assigned during normal business hours.  If Contractor wishes to have an authorized representative pick up the check, Contractor must first deliver to Carrier a signed and dated letter giving the full name, address, and telephone number of the representative and stating the period during which Contractor wishes the representative to pick up the check on Contractor's behalf.

5. <u>METHOD OF DELIVERY OF SETTLEMENT STATEMENT.</u>  Carrier shall deliver Settlement Statements, including any attachments, to Contractor through the OPTION specified by Contractor below:

Contractor SHOULD INITIAL <u>ONLY ONE</u> OF THESE FOUR OPTIONS (on the line to the left):

_____  **OPTION 1 (U.S. First Class Mail):**  Carrier shall send the Settlement Statements to Contractor by U.S. First Class Mail to the address required by Section 13 (Notices) of this Agreement or to the address shown under OPTION 2 of Section 4 of this Appendix.

_____  **OPTION 2 (Fax):**  Carrier shall fax the Settlement Statements to Contractor at fax number
_____.

_____  **OPTION 3 (Email):**  Carrier shall email the Settlement Statements to Contractor at the email address shown in Appendix D (Consent to Conduct Business by Electronic Methods) of this Agreement if the parties have agreed to email communication by both parties so indicating in and then signing Appendix D.

_____  **OPTION 4 (Online):**  Carrier shall post the Settlement Statements on the password-protected webpage, accessible only to Carrier and Contractor, identified in Appendix D of this Agreement if the parties have agreed to online communication by both parties so indicating in and then signing Appendix D.

THIS APPENDIX B, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ ___.m. Central Time on the _____ day of _____, 20___.

Contractor: _____

By: _____
      Signature

_____
Authorized Representative's Name (Typed or Printed)

Title _____

Date  01-03-18

_____
Driver's Name if Different

_____
Tractor No.

Carrier:   CRST Expedited, Inc.

By: _____
      Signature

Phillip Reges
Director – Operations - IC
3930 16th Avenue
Cedar Rapids, IA  52406
Tel. 319-731-3890
Fax 319-731-9245

## APPENDIX C

## SUBLEASE OF EQUIPMENT LEASED TO

_____

Through this agreement and pursuant to 49 C.F.R. § 376.12(c)(2) ("Sublease"), the undersigned _____ ("Sublease Carrier") agrees to lease from CRST Expedited, Inc. ("Carrier"), and Carrier to lease to Sublease Carrier, the following commercial motor vehicle equipment ("Equipment"), currently under lease from _____ ("Contractor"):

| CONTRACTOR'S EQUIPMENT | CARRIER UNIT # | YEAR | MAKE | MODEL | SERIAL (VIN) # | BASE PLATE # |
|---|---|---|---|---|---|---|
| Tractor | | | | | | |

1.    **TERM.**  Absent default, this Sublease shall begin at the time(s) set forth on completed Equipment Receipt(s), in the form attached hereto, that Sublease Carrier shall furnish to Carrier ("Effective Date"), and end when possession of the Equipment is returned to Carrier.  This Sublease may be terminated at any time for any reason by either party on oral, followed by written, notice of termination to the other party.  If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of Sublease Carrier or Carrier under this Sublease, such liability or entitlement shall continue, notwithstanding the termination of this Sublease, until such liability or entitlement is satisfied in full.

2.    **IDENTIFICATION OF EQUIPMENT.**  Sublease Carrier shall ensure that for the duration of the Sublease, the identification of equipment requirements in 49 C.F.R. § 376.11(c) are complied with by removing or covering up all of Carrier's identification on the Equipment and displaying instead Sublease Carrier's identification.

3.    **CONTROL AND RESPONSIBILITY.**  Sublease Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the Sublease from the time possession is taken by the Sublease Carrier and the receipt required under 49 C.F.R. § 376.11(b) is given to Carrier until possession of the Equipment is returned to Carrier. The foregoing declarations are made in order to comply with FMCSA regulations (49 C.F.R. § 376.12(c)(1)) and shall not be used to classify Contractor as an employee of Sublease Carrier or Carrier.  As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether Contractor and Contractor's drivers are independent contractors or employees of Sublease Carrier or Carrier and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements".

4.    <u>**INDEMNIFICATION.  Sublease Carrier shall defend, indemnify, and hold harmless Carrier from any claim (including any for which Carrier not indemnified by Carrier's insurance and any claim of loss of or damage to the Equipment or to Carrier's other property) of loss, damage, delay, fine, civil penalty, or expense, including reasonable attorney's fees and costs of litigation (together "Damages") that Carrier pays or otherwise incurs arising out of or in connection with the Sublease Carrier's or Contractor's (including their respective agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions.**</u>

5.    **INSURANCE.**  Sublease Carrier agrees to, and warrants that Sublease Carrier does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least the amounts required by Federal Motor Carrier Safety Administration regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, covering the Equipment for the duration of this Sublease.  These insurance coverages shall be primary, as between Sublease Carrier and Carrier, to any insurance coverages that Carrier may maintain.  Sublease Carrier shall evidence the insurance coverages by furnishing to Carrier, along with this executed Sublease, a valid certificate of insurance.

6.    **SUBLEASE CARRIER'S COMPENSATION OF CONTRACTOR.**  Sublease Carrier shall enter into an independent contractor operating agreement with Contractor regarding compensation (including the sublease payments owed to Carrier pursuant to Section 7 of this Appendix) and other terms that complies with the Federal Truth-in-Leasing Regulations, 49 C.F.R. Part 376, and shall pay Contractor the agreed compensation, within (fifteen) 15 calendar days after Contractor submits to Sublease Carrier the driver log books required by the U.S. Department of Transportation and those documents necessary for Sublease Carrier to secure payment of freight charges from the shipper (together "Sublease Trip Documents").

7.    **SUBLEASE PAYMENTS.**  As consideration for this Sublease, Sublease Carrier shall remit to Contractor at the same time Sublease Carrier pays compensation to Contractor for a trip, and Contractor has agreed to remit the same amount to Carrier, a $150-per-trip Alternative Use Fee.

8.   **DRIVER LOGS.**  Sublease Carrier shall obtain from Contractor a copy of all driver logs after each trip.  All driver logs should name both Carrier and Sublease Carrier; show all duty time for each 24-hour period of each trip; and the beginning and finishing time (designating a.m. or p.m.) worked for each identified motor carrier.  Pursuant to 49 C.F.R. § 395.8(j), before each Sublease trip, Contractor shall provide to Sublease Carrier a signed statement stating the Contractor's total time on duty during the immediately preceding seven days and the time at which Contractor was last relieved from duty prior to beginning work for CARRIER.

9.   **CONTROLLED SUBSTANCES TESTING PROGRAM.**  Sublease Carrier shall obtain from Carrier at least once every six months thereafter (if subleasing is continuing even intermittently) the following information relating to Carrier's controlled substances testing program: the name and address of the program; a verification that Contractor participates or participated in the program; a verification that the program conforms to 49 C.F.R. Part 40; a verification that Contractor is qualified under 49 C.F.R. Part 382, including that Contractor has not refused to be tested for controlled substances; the date Contractor was last tested for controlled substances; and the results of any tests taken within the previous six months and any other violations of Subpart B of 49 C.F.R. Part 382.  If Sublease Carrier cannot verify that Contractor is participating in a controlled substances testing program in accordance with 49 C.F.R. Parts 40 and 382, Sublease Carrier shall administer an initial controlled substances test to Contractor.

10.   **QUALIFICATION CERTIFICATE.**  By executing, along with Contractor, the attached "Qualification Certifi-cate", Carrier hereby certifies that Contractor is fully qualified to drive a commercial motor vehicle under the rules in 49 C.F.R. Part 391.  Pursuant to 49 C.F.R. § 391.65(b)(1), Sublease Carrier and Carrier agree that Sublease Carrier has veri-fied the validity of the Qualification Certificate.  Sublease Carrier agrees to maintain the Qualification Certificate for a period of three years from the Effective Date of this Sublease.

11.   **DRIVER VEHICLE INSPECTION REPORTS AND REPAIR RECORDS.**  For the term of this Sublease, Carrier shall require Contractor to prepare and submit a written Driver Vehicle Inspection Report complying with the require-ments of 49 C.F.R. § 396.11, and Carrier shall obtain from Contractor and maintain all records relating to repairs of the Equipment.

12.   **INTERNATIONAL REGISTRATION PLAN REPORTING.**  With respect to International Registration Plan reporting, Sublease Carrier shall be responsible for reporting all miles traveled by Contractor's Equipment and in what state(s).  Sublease Carrier shall provide Carrier promptly with documentation showing all miles traveled by state for each trip.

13.   **INDEPENDENT CONTRACTOR RELATIONSHIP.**  It is the intent of the parties to this Sublease that Sub-lease Carrier, Carrier, and Contractor shall all be independent contractors.

14.   **COPY OF SUBLEASE.**  Sublease Carrier shall ensure that a copy of the Sublease is carried in the Equipment for the duration of the Sublease.

15.   **GENERAL.**  If any provision (including any sentence or part of a sentence) of this Sublease (including its appendices and addendums) is deemed invalid for any reason whatsoever, the Sublease shall be void only as to such provi-sion, and this Sublease shall remain otherwise binding between the parties.  This Sublease (including the appendices and any addendums) constitute the entire Sublease between Carrier and Sublease Carrier pertaining to the subject matter con-tained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and under-standings.  No supplement, modification, or amendment to this Sublease shall be binding unless in writing and signed by both parties. Original, faxed, or otherwise imaged signatures shall be equally valid.

16.   **GOVERNING LAW AND FORUM.**  This Sublease shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of Iowa, without regard to the choice-of-law rules of Iowa or any other ju-risdiction.  THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS SUBLEASE, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING CEDAR RAPIDS, IA.  CARRIER AND SUBLEASE CARRIER HEREBY CONSENT TO THE JURISDICTION AND VENUE OF SUCH COURTS.

IN WITNESS WHEREOF, the parties hereby execute this Sublease on this _____ day of _____, 20___.

SUBLEASE CARRIER:_____

Fed. Taxpayer ID No. _____

By: _____
    Signature

_____
Authorized Rep.'s Name (Typed or Printed)

_____
Title

_____
Address (Street, P.O. Box)

_____
City, State & Zip Code

_____
Mobile Telephone Number    Fax Number

_____
Email Address

CARRIER: CRST EXPEDITED, INC.

By: _____
    Signature

Phillip Reges
Director – Operations - IC
3930 16th Avenue
Cedar Rapids, IA  52406
Tel. 319-731-3890
Fax 319-731-9245

## QUALIFICATION CERTIFICATE

Pursuant to 49 C.F.R. § 391.65, CRST Expedited, Inc. ("Carrier") certifies that the undersigned independent contractor ("Contractor"), as defined in 49 C.F.R. § 390.5, is regularly driving a commercial motor vehicle operated by CARRIER and is fully qualified under 49 C.F.R. Part 391.    His current medical examiner's certificate expires on _____.  This Qualification Certificate expires on _____ (a date not later than the expiration of the medical examiner's certificate).

Issued on _____ by:

CONTRACTOR:        _____        CARRIER: CRST EXPEDITED, INC.
*Check one:*        ☐ Corporation
            ☐ Limited Liability Company
            ☐ Partnership
            ☐ Sole Proprietorship
*Organized in State of:* _____
*With Employer ID No.:* _____
*OR Social Security No. (last 4 digits):* _____

By: _____        By: _____
    Signature                    Signature

_____        Phillip Reges
Authorized Rep.'s Name (Typed or Printed)    Director – Operations - IC
                        3930 16th Avenue
_____        Cedar Rapids, IA  52406
Title                    Tel. 319-731-3890
                        Fax 319-731-9245
_____
Address (Street, P.O. Box)

_____
City, State & Zip Code

_____        _____
Mobile Telephone Number        Fax Number

_____
Email Address

_____
Date

## APPENDIX D

### CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS

1.   Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011), issued by the Federal Motor Carrier Safety Administration ("FMCSA"), CRST Expedited, Inc. ("Carrier") and the contractor who completes the signature block below ("Contractor") hereby consent and agree to conduct business using one or more of the following methods:

  1(A).   **Captured Image Method.** Under the Captured Image Method, an image of a scripted name or legal mark is created using a stylus on an electronic pad, and that image is then used to populate an electronic version of the document to be signed electronically by Carrier, Contractor, or both, as authorized by FMCSA in its guidance in response to Question 6 at 74 Fed. Reg. 411, 413.

  1(B).   **Communications Equipment Method.** Under the Communications Equipment Method, electronic signatures are accomplished via the Communications Equipment System, as described in Section 5(E) of this Agreement and Section 3 of Appendix A, installed in the Equipment in a manner that identifies and authenticates Contractor as the user of the System and the source of the electronic communication (i.e., by Contractor's logging onto the System with Contractor's unique Driver Number and Owner Number and electronically signing messages by appending to the electronic communication the last four digits of Contractor's Social Security Number or another form of identification known only to Contractor).

  1(C).   **Web-Portal Method.** Under the Web-Portal Method, electronic signatures are accomplished via a web portal in a manner that identifies and authenticates Contractor as the source of the electronic communication transmitted through the web portal (i.e., by Contractor's logging onto the web portal using unique credentials) and indicates Contractor's approval of the information contained in the electronic communication (i.e., by Contractor's clicking on an "I Accept" dialog box after reviewing electronic communications on the web portal).

2.   This consent encompasses the use of electronic methods to accomplish the signature of any document, including, without limitation, any supplement, modification, addendum, amendment, notice, consent and/or waiver, required by this Agreement or required by FMCSA regulations to be generated and maintained (or exchanged by private parties), including, without limitation, applications, driver histories and other qualification records, leases formed under 49 C.F.R. Part 376, driver-vehicle inspection reports, and records of duty status.

3.   The parties agree that when Contractor uses any of the above electronic methods described in Section 1 of this Appendix to accomplish electronic signatures, the chosen method: (1) identifies and authenticates Contractor as the source of the electronic communication; (2) indicates Contractor's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature.

4.   The parties agree that when Carrier uses any of the above electronic methods described in Section 1 of this Appendix to accomplish electronic signatures, the chosen method: (1) identifies and authenticates Carrier as the source of the electronic communication; (2) indicates Carrier's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature.

5.   Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature, of the above-specified kind, to the same document.

**THIS APPENDIX D is agreed to by the undersigned parties as of the latest date set forth below.**

Contractor: _____
              Name (Typed or Printed)

If Sole Proprietor: _____
                     Social Security No. (last 4 digits)

If Corp., Prtnrshlp, or LLC: _____
                              Fed. Taxpayer ID No.

By: _Aulhay lumt_
      Signature

_____
Authorized Representative's Name (Typed or Printed)

_____
Title

_____
Address (Street, P.O. Box)

_____
City, State & Zip Code

_____
Telephone Number          Fax Number

_____
Email Address

_01-03-18_
Date

Carrier:       CRST Expedited, Inc.

By: _____
      Signature

Phillip Reges
Director – Operations - IC
3930 16th Avenue
Cedar Rapids, IA  52406
Tel. 319-731-3890
Fax 319-731-9245

## APPENDIX E

### PRIVACY-RELATED DISCLOSURES AND CONSENT FORM

EOBR Requirement and Its Purposes.  All Contractors that enter into an Independent Contractor Operating Agreement ("Agreement") with CRST Expedited, Inc. ("Carrier") have, under the Agreement (including Section 4(C)(3)) and this Appendix, agreed to maintain in each unit of Equipment (as defined in Section 1(A) of the Agreement) a compliant and functioning Electronic On-Board Recorder (referred to in the Agreement and this Form as "Communication System/EOBR" or simply "EOBR")), also sometimes referred to as an Electronic Logging Device ("ELD").  The principal purpose of this new requirement is to assist Contractor's drivers and Carrier in complying with Federal Motor Carrier Safety Administration's ("FMCSA") Hours of Service regulations and other Applicable Law (as defined in Section 4 of the Agreement) and in avoiding adverse safety scores and FMCSA interventions under FMCSA's Compliance, Safety, Accountability ("CSA") Program.  The EOBR may also assist in providing load dispatching and tracking services to meet the requirements of Carrier's customers.

Categories of Electronic Information Collected by EOBR.  The EOBR is capable of collecting various categories of data regarding the Equipment and its operation, including but not limited to (collectively "Electronic Information"):

- Name of the driver and any co-driver(s), and corresponding driver identification information
- Duty status (that is, "Off Duty," "Sleeper Berth," "Driving," and "On-Duty Not Driving")
- Date and time the Equipment is in operation
- Location of the Equipment (as determined by satellite or terrestrial sources)
- Distance travelled (including when the Equipment crosses state lines)
- Name and U.S. Department of Transportation number of Carrier
- 24-hour period starting time
- Multiday basis used by Carrier to compute cumulative duty hours and driving time.
- Hours in each duty status for the 24-hour period, and total hours
- Equipment number
- Load information, such as shipping document number(s), or name of shipper and commodity(ies)
- Fuel use, including when the Equipment is refueled
- Speed of the Equipment
- Hard-braking events
- Power-on self-tests and diagnostic error codes.

The Electronic Information is transmitted from your Equipment to the third-party vendor of the EOBR (*see below*) and then from the vendor to Carrier. Carrier may from time to time access certain categories of the Electronic Information in furtherance of its efforts to comply with Applicable Law, including FMCSA's Hours of Service regulations, or to meet customer requirements.

Carrier Uses of the Electronic Information.  The third-party vendor – Omnitracs, LLC -- responsible for the collection and storage of the Electronic Information.  Carrier does not collect or store the Electronic Information, but has access to the Electronic Information and reserves the right to request that the third-party vendor collect and store the Electronic Information for as long as the Equipment with the EOBR installed operates under lease to Carrier, and for a reasonable time thereafter.  If Contractors or their drivers have questions about the safeguards those companies have put in place to protect against the loss, unauthorized access, use, destruction, or improper disclosure of the Electronic Information may contact Omnitracs, Inc. at http://www.omnitracs.com.  Carrier has reasonable safeguards in place to secure the Electronic Information it receives from the third-party vendors, and limits access to the Electronic Information to authorized individuals who need to know the information in order to comply with Applicable Law, including the Hours of Service Regulations.

Right to Review Electronic Information.  Contractor and any Contractor's driver shall have the right, on written request to Carrier, to review the collected Electronic Information that Carrier itself continues to have access to, but only Electronic Information relating to the requesting Contractor (including that Contractor's drivers') or the requesting driver, respectively.  A written request for such a review should be addressed to me by email or U.S. Mail.

Signing This Form.  By signing below, the listed Contractor (whether or not a driver) and Driver (if any, employed by Contractor) represents that he/she has read and understood the privacy-related disclosures described above.

CONSENT TO CARRIER'S ACCESSING CERTAIN SAFETY-PERFORMANCE DATA OF DRIVERS.  In addition, by signing below, the listed Contractor (if a driver) and Driver (if any, employed by Contractor) authorize Carrier to access applicable driver files, FMCSA Safety Measurement System ("SMS") safety scores and other data, and FMCSA's Pre-Employment Screening System ("PSP") reports on such driver, both during the qualification process and at any time thereafter.

If you have questions regarding the Electronic Information collected through the EOBR or how the Electronic Information is accessed and used by Carrier, please feel free to contact your Operations Director. Thank you.

| If you are a **Contractor** (or authorized officer, partner, member, or proprietor of one) for CRST Expedited, Inc., please complete this signature block: | OR, If you are a **professional truck driver employed by** such a Contractor, please complete this signature block: |
|---|---|
| CONTRACTOR (Print Name): | DRIVER (Print Name): _____ |
|  | Soc. Sec. No. (last 4 digits only): _____ |
| Employer ID No.: _____ | Employed by CONTRACTOR (Print Name): |
| OR Soc. Sec. No. (last 4 digits only): _____ |  |
| By: _Autumn Kennit_ | By: _____ |
|    Signature |    Signature |
| Printed Name of Authorized Rep., if any |  |
| Title |  |
| Mobile Telephone Number | Mobile Telephone Number |
| _01-03-18_ |  |
| Date | Date |

CRST EXPEDITED, INC.

STATEMENT OF LEASE

To the extent provided by the Independent Contractor Operating Agreement entered into between _____Anthony Cervantes_____ ("Contractor") and CRST Expedited, Inc. ("Carrier") on _____ 03 , 20 18 ("ICOA" or "lease"), this Equipment is being operated by the undersigned Carrier. Contractor is the Equipment's "owner," as the latter term is defined by 49 C.F.R. § 376.2(d). The ICOA is for a term commencing at ___:___ __.m. Central Time on the _____ day of _____, 20___; and ending at 11:59 p.m. Central Time on October 1, 2018, unless sooner terminated by either party pursuant to Section 14 of this Agreement and includes no restrictions relative to the commodities to be transported. The original of the ICOA is kept by Carrier at its headquarters address, shown below.

Pursuant to 49 C.F.R. § 376.11(c)(2), A COPY OF THIS "STATEMENT OF LEASE" IS TO BE CARRIED ON THE EQUIPMENT DURING ALL PERIODS THAT, PURSUANT TO THE ICOA, THE EQUIPMENT IS BEING OPERATED BY OR ON BEHALF OF CARRIER.

Contractor: _____

By: _____
        Signature

_____
Authorized Representative's Name (Typed or Printed)

_____          _____
Title                              Driver's Name If Different

01-04-18                      116030
Date                            Tractor No.

Carrier:        CRST Expedited, Inc.

By: _____
        Signature

Phillip Reges
Director -- Operations - IC
3930 16th Avenue
Cedar Rapids, IA  52406
Tel. 319-731-3890
Fax 319-731-9245

CRST Expedited, Inc. Independent Contractor Operating Agreement

## ADDENDUM -- EQUIPMENT LEASE CHARGES

Whereas the undersigned Contractor has elected to lease a vehicle from CRST Lincoln Sales, Inc., 3930 16th Avenue, SW, Cedar Rapids, IA, 52406-0068 ("Lincoln Sales")) to use as the Equipment under the CRST Expedited, Inc. Independent Contractor Operating Agreement ("Agreement") Contractor has entered into with CRST Expedited, Inc. ("Carrier"), and whereas Contractor wishes to have Carrier, and Carrier is willing to, deduct the vehicle rent and related payments from Contractor's settlement compensation or otherwise recover them pursuant to Section 6(A) of the Agreement, the parties agree, pursuant to Section 16(D)(3) of the Agreement, to amend the Agreement as follows:

1.    **OVERALL LEASE PAYMENTS.**   Contractor hereby authorizes and directs Carrier to deduct from Contractor's compensation or otherwise recover pursuant to Section 6(A) of the Agreement, and to remit electronically to Lincoln Sales each week, the Overall Lease Payment items computed under the attached "Authorization and Assignment" and accompanying "Lincoln Sales, Inc. Equipment Lease," entered into by Contractor (as "Lessee") and Lincoln Sales (as "Lessor") on _____ ____, 20___, in the varying amounts communicated to Carrier by Lincoln Sales. Upon termination of either the Agreement or the attached Equipment Lease, Contractor authorizes and directs Carrier to deduct from Contractor's Escrow Fund (to the extent permitted under Section 8 of the Agreement) or otherwise recover pursuant to Section 6(A) of the Agreement, to the extent Contractor's compensation is insufficient, all amounts due and owing Lincoln Sales. This Addendum is being executed by Carrier and Contractor to comply with the requirements of 49 C.F.R. § 376.12(i).

2.    CONTRACTOR HEREBY ACKNOWLEDGES THAT VEHICLES SUITABLE FOR CONTRACTOR'S PROVISION OF SERVICES UNDER THE AGREEMENT ARE AVAILABLE FOR PURCHASE OR LEASE FROM NUMEROUS VENDORS OTHER THAN LINCOLN SALES AND THAT CONTRACTOR IS NOT REQUIRED TO LEASE A VEHICLE FROM LINCOLN SALES AS A CONDITION OF ENTERING INTO THE AGREEMENT.

3.    **LIMITED SCOPE AND COPIES.**   Except as expressly amended by this Addendum -- or by other addendums or amendments, if any, not inconsistent with this Addendum -- the Agreement shall remain in full force and effect in accordance with its terms. Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor. Both parties shall then attach this Addendum to their copy of the Agreement.

THIS ADDENDUM, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ ___.m. Central Time on the _____ day of _____, 20___.

CONTRACTOR: _____

By: _Anthony Bennett_
          Signature

_____
Authorized Rep.'s Name (Typed or Printed)

Title

_01-03-18_
Date

CARRIER: CRST EXPEDITED, INC.

By: _____
          Signature

Phillip Reges
Authorized Rep.'s Name (Typed or Printed)

_____
Title

_____
Date

**CRST Expedited, Inc. Independent Contractor Operating Agreement**

## ADDENDUM -- AMERICAN TRUCK BUSINESS SERVICES

Whereas the undersigned Contractor wishes to purchase accounting and other services from American Truck Business Services, and whereas CRST Expedited, Inc. ("Carrier") is willing to facilitate such purchase through settlement deductions and other means of recovery, therefore, pursuant to Section 16(D)(3) of the CRST Expedited, Inc. Independent Contractor Operating Agreement ("Agreement") they have entered into, the parties hereby agree to amend the Agreement as follows:

1.    PURCHASE OF SERVICES.  By signing this Addendum, Contractor elects to obtain accounting and other business services from American Truck Business Services ("ATBS") in accordance with a contract between Contractor and ATBS, documentation of which is attached.

2.    SETTLEMENT DEDUCTION OR OTHER RECOVERY.  Contractor hereby authorizes and directs Carrier to deduct or otherwise recover pursuant to Section 6(A) of the Agreement, and to remit to ATBS, initially $_____ per month and, in the future, such other amounts as may be billed by ATBS to Contractor through Carrier.

3.    DISCONTINUATION.  Contractor may discontinue the above deductions from compensation by requesting such discontinuation in a written notice to Carrier, attaching a copy of the letter or other document by which Contractor has given ATBS written notice of Contractor's wish to cancel his/her participation in the plan.

4.    LIMITED SCOPE AND COPIES.  Except as expressly amended by this Addendum – or by other addendums or amendments, if any, not inconsistent with this Addendum – the Agreement shall remain in full force and effect in accordance with its terms.  Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor.  Both parties shall then attach this Addendum to their copy of the Agreement.

THIS ADDENDUM, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ____:____ ___.m. Central Time on the _____ day of _____, 20____.

CONTRACTOR:_____          CARRIER: CRST EXPEDITED, INC.

By:_____          By:_____
        Signature                                  Signature

                                          Phillip Reges
Authorized Rep.'s Name (Typed or Printed)   Authorized Rep.'s Name (Typed or Printed)

_____          _____
Title                                      Title

_____          _____
Date                                       Date

CRST Expedited, Inc. Independent Contractor Operating Agreement

ADDENDUM – CO-DRIVER SCHOOLING

Whereas the undersigned Contractor may wish in the future to have CRST Expedited, Inc. ("Carrier") arrange for driver-training of a co-driver, and whereas Carrier is willing to advance the expense and deduct or otherwise recover it from Contractor pursuant to Section 6(A) of the CRST Expedited, Inc. Independent Contractor Operating Agreement ("Agreement") that Contractor and Carrier have entered into, the parties agree, pursuant to Section 16(D)(3) of the Agreement, to amend the Agreement as follows:

1.  **CO-DRIVER SCHOOLING.**  If Contractor elects to have Carrier arrange for Co-Driver Schooling by signing this Addendum, Carrier shall arrange to have a driver-training school that it has approved furnish driver-training services (including all necessary classroom and in-vehicle training, written training materials and housing cost) and driver-qualification services (including DOT-required physical examination and prequalification drug test), beginning on _____ ____, 20__, to

[NAME]                         _____ ("Co-Driver")

[STREET ADDRESS]        _____

[CITY, STATE, ZIP CODE]  _____

[PHONE]                       _____

2.  **PAYMENT FOR SCHOOLING.**  Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of the Agreement the cost of such driver-training services and driver-qualification services, which shall total two thousand five hundred dollars ($2,500) (including administrative fee and markup to Carrier) at the rate of fifty dollars ($50) per week, beginning with the week of _____ ____, 20__.  The total comprises schooling and transportation expense paid to third-party vendors (including any admin. fee to Carrier), drug testing expense paid to third-party vendor (including any admin. fee to Carrier), actual lodging expense paid to third-party vendors (not including an admin. fee to Carrier), and a processing fee retained by Carrier.

3.  CONTRACTOR ACKNOWLEDGES THAT DRIVER TRAINING SUITABLE FOR CONTRACTOR'S PLANNED CO-DRIVER IS AVAILABLE FOR PURCHASE FROM NUMEROUS DRIVER-TRAINING SCHOOLS OTHER THAN CARRIER'S, AND THAT CONTRACTOR IS NOT REQUIRED TO OBTAIN DRIVER TRAINING FOR CONTRACTOR'S CO-DRIVER FROM CARRIER'S SCHOOL AS A CONDITION OF ENTERING INTO THE AGREEMENT.

4.  **LIMITED SCOPE AND COPIES.**  Except as expressly amended by this Addendum – or by other addendums or amendments, if any, not inconsistent with this Addendum – the Agreement shall remain in full force and effect in accordance with its terms.  Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor.  Both parties shall then attach this Addendum to their copy of the Agreement.

THIS ADDENDUM, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ ___.m. Central Time on the _____ day of _____, 20___.

CONTRACTOR:                               CARRIER: CRST EXPEDITED, INC.

By: _____              By: _____
        Signature                                 Signature

_____                  Phillip Reges
Authorized Rep.'s Name (Typed or Printed)  Authorized Rep.'s Name (Typed or Printed)

Title _____            Title _____

Date   01-03-18                          Date _____

## CRST Expedited, Inc. Independent Contractor Operating Agreement
## ADDENDUM -- DRIVER RECRUITING

Whereas the undersigned Contractor may in the future wish to employ (together, "hire") an individual serving at the time as an employee-driver by CRST Expedited, Inc. ("Carrier"), and whereas Carrier does not wish to lose the services of a driver whom Carrier, on average, has incurred substantial expense to recruit and, in some instances, provide driver schooling to, without receiving compensation, the parties agree, pursuant to Section 16(D)(3) of the CRST Expedited, Inc. Independent Contractor Operating Agreement ("Agreement") they have entered into, to amend the Agreement as follows:

1.    **LIMITATION ON HIRING.**  For the duration of the Agreement and for six months after its termination, Contractor shall not, without Carrier's prior written consent, hire an individual with a commercial driver's license ("CDL") who is employed at the time as a commercial truck driver by Carrier.

2.    **RECRUITING FEE.**  If Contractor elects, with Carrier's prior written consent, to hire an individual with a commercial driver's license ("CDL"), employed at the time by Carrier, Contractor agrees to pay Carrier a fee, per driver, of:

2(A).    Six thousand five hundred dollars ($6,500), reflecting Carrier's approximate average cost of recruiting a new employee-driver (not including the cost of driver schooling to obtain a CDL), plus

2(B).    Any portion of the driver's driver-schooling expense not already reimbursed to Carrier if the driver received, at Carrier's expense, driver schooling to obtain a CDL and has not yet fulfilled his/her contractual commitment to Carrier either to drive for Carrier for the contractually required number of months or to reimburse Carrier the full schooling-expense amount set forth in the driver's driver-schooling contract with Carrier.

3.    **FULL FEE OWED.**  Contractor shall owe the full amount of the recruiting fee computed pursuant to Section 2 of this Addendum, regardless of how short a period the driver remains an employee of Contractor.

4.    **TIMING OF PAYMENTS.**  If Contractor elects not to pay the $6,500 employee-driver recruiting fee under Section 2(A) of this Addendum in a lump sum before the driver begins his/her service with Contractor, Contractor hereby authorizes Carrier to deduct the fee in weekly installments of three hundred fifty dollars ($350) each, or otherwise recover it pursuant to Section 6(A) of the Agreement, until fully paid.  Any additional amount owed under Section 2(B) of this Addendum, however, must be paid immediately in a lump sum.

5.    **DRIVER QUALIFICATION.**  Carrier's employment of the driver shall cease immediately upon the driver's first performing services for Contractor, if Carrier's employment of the driver has not already ended for other reasons.  As long as Contractor continues thereafter to provide services to Carrier pursuant to the Agreement and no otherwise disqualifying circumstances develop, the driver shall remain qualified by Carrier, under Federal Motor Carrier Safety Administration driver-qualification requirements, to operate Equipment leased to Carrier.

6.    CONTRACTOR ACKNOWLEDGES THAT COMMERCIAL TRUCK DRIVERS CAPABLE OF MEETING CARRIER'S DRIVER QUALIFICATIONS AND OF SERVING AS A DRIVER OF CONTRACTOR'S EQUIPMENT ARE AVAILABLE FOR HIRE FROM SOURCES OTHER THAN CARRIER AND THAT CONTRACTOR IS NOT REQUIRED TO HIRE A DRIVER EMPLOYED AT THE TIME BY CARRIER AS A CONDITION OF ENTERING INTO THE AGREEMENT.

7.    **LIMITED SCOPE AND COPIES.**  Except as expressly amended by this Addendum – or by other addendums or amendments, if any, not inconsistent with this Addendum – the Agreement shall remain in full force and effect in accordance with its terms.  Carrier shall keep the original of this Addendum and furnish a copy, signed by both parties, to Contractor.  Both parties shall then attach this Addendum to their copy of the Agreement.

THIS ADDENDUM, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at ___:___ ___.m. Central Time on the _____ day of _____, 20___.

CONTRACTOR:

By: _____
    Signature

_____
Authorized Rep.'s Name (Typed or Printed)

Title
O1-03-18
_____
Date

CARRIER: CRST EXPEDITED, INC.

By: _____
    Signature

Phillip Reges
_____
Authorized Rep.'s Name (Typed or Printed)
Director -- Independent Contractors
_____
Title

_____
Date